2025 IL App (3d) 240079

Opinion filed September 25, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| JEFFREY WILSON, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellee and Counter-Appellant, | ) | Du Page County, Illinois, |
| | ) | |
| | ) | |
| v. | ) | Appeal No. 3-24-0079 |
| | ) | Circuit No. 18-L-1245 |
| | ) | |
| NAPLETON'S GOLDCOAST IMPORTS, | ) | |
| INC., d/b/a Napleton's Aston Martin | ) | |
| of Chicago, | ) | |
| | ) | Honorable |
| Defendant-Appellant and Counter-Appellee. | ) | David E. Schwartz, |
| | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justice Hettel concurred in the judgment and opinion.
Justice Anderson concurred in part and dissented in part, with opinion.

_____

**OPINION**

¶ 1 On October 31, 2023, the trial court entered judgment in favor of plaintiff-appellee and counter-appellant, Jeffrey Wilson, and against defendant-appellant and counter-appellee, Napleton's Goldcoast Imports, Inc. (Napleton's), on claims of common law fraud (count I) and violations of the Consumer Fraud and Deceptive Business Practices Act (Act) (815 ILCS 505/1 *et seq.* (West 2022)) (count II). As part of its judgment, the court granted Napleton's request for

remittitur of the jury's award for common law fraud from $1,163,544 ($163,544 in compensatory damages and $1,000,000 in punitive damages) to $499,616 ($99,616 in compensatory damages and $400,000 in punitive damages). The court did not obtain Wilson's consent to the remittitur. The court then stated that it would issue compensatory damages for Wilson's claim under the Act in the same amount as the remitted judgment for common law fraud but that Wilson could recover only once. The court did not clearly award punitive damages for Wilson's claim under the Act, and it certainly did not specify the amount of punitive damages for Wilson's claim under the Act, if any. It did, however, award Wilson $185,411 in attorney fees and $5,040 in costs under the Act.

¶ 2        This appeal and cross-appeal followed. For the reasons that follow, as to count I, we affirm the finding of liability, we reverse the remitted damages judgment as to both compensatory and punitive damages, and we remand for the trial court to follow proper remittitur procedure as to both compensatory and punitive damages. As to count II, we affirm the compensatory award as well as the award of attorney fees and costs, and we remand for the trial court to clarify whether it awarded punitive damages and, if so, in what amount.

¶ 3                                    I. BACKGROUND

¶ 4                    A. Wilson's Claims, Partial Summary Judgment, Trial, and Verdict

¶ 5        In November 2015, Napleton facilitated Wilson's leasing of a 2014 Aston Martin through a third-party financer without disclosing it had been in an accident that had caused extensive front-end damage. Specifically, after Wilson spoke with Napleton salespersons and was affirmatively told that the car had not been in an accident, Napleton sold the car to a third-party financer for $135,177, which, in turn, entered into a 60-month lease with Wilson. Among other expenses, the lease was $1,900 per month, with the option to purchase the vehicle for $60,000 at the end of the

2

lease. The lease had a mileage limit of 25,000, after which point Wilson would incur a penalty of $1.50 per mile.

¶ 6     Per Wilson, Napleton must have been aware of the car's accident history, because the client that owned the car at the time of the accident had purchased the car from Napleton and Napleton assisted the repair shop in procuring parts for the repair. The repairs cost $60,000 and took place over a period of seven months. Approximately four months after the repairs were completed, the original client sold the car back to Napleton as part of a trade-in/purchase deal. Napleton posted a CarFax report to its website that inaccurately reported that the car had not been in an accident. Wilson, who lived in Arizona, testified that he relied on Napleton's representation that the car was in pristine condition and that he would not have entered into the coordinated lease if he had known of the car's accident history. Upon receiving the car, he noticed squeaky brakes, which he had repaired, but otherwise had no significant mechanical issue. Nearly halfway into the 60-month lease, Wilson hit the mileage limit and began looking to trade in the car. He contacted a dealer in California, who informed him that the CarFax report, updated just one month prior, showed that the car *had* been in an accident. Wilson tried but was unable to resell the car. An appraiser testified that high-end luxury vehicles that have been in serious accidents were extremely difficult to resell.

¶ 7     On October 31, 2018, Wilson initiated the instant lawsuit by filing a one-count complaint for common law fraud. In June 2020, Wilson filed an amended two-count complaint, alleging (1) common law fraud (count I) and (2) violation of the Act (count II). The Act provides consumers with broader protection than under common law. *Ash v. PSP Distribution, LLC*, 2023 IL App (1st) 220151, ¶ 24. For example, a violation under the Act may be based on an innocent or negligent representation as well as one that is intentional. *Id.* In addition, attorney fees and court costs are available under the Act. 815 ILCS 505/10a(c) (West 2022).

¶ 8        In March 2021, the trial court granted Wilson summary judgment on count II on the issue of liability, finding that Napleton violated the Act, but reserved the question of damages. The court stated that it would hear the question of damages for count II simultaneous to the jury trial on count I. Prior to trial, on April 12, 2023, Wilson filed a second amended complaint. As with the prior complaints, Wilson sought damages for out-of-pocket costs.

¶ 9        During the course of the trial, the court made two evidentiary rulings relevant here: the admission of other-bad-acts evidence and the exclusion of evidence regarding settlement negotiations and out-of-pocket costs. First, the trial court granted Wilson's motion to pursue punitive damages at trial based on Napleton's conduct in another transaction: Napleton's 2020 repurchase of the same car from the third-party financer during the pendency of the instant lawsuit and resale to Bart Miller of Florida in 2021. The court allowed evidence of the 2021 Miller transaction over Napleton's objection. The evidence showed that Napleton gave Miller the corrected CarFax report, which disclosed the accident. However, Napleton also gave Miller a True360 report, representing that the repairs had been minor and cosmetic when, in fact, Napleton's general manager ultimately conceded that was not true. Miller testified in deposition that Napleton did not disclose the severity of the accident, the extent of the repairs, or that the car was at the center of a pending lawsuit.

¶ 10       Second, the trial court granted Wilson's objection to evidence of settlement negotiations pursuant to Illinois Rule of Evidence 408 (eff. Jan. 1, 2011) (prohibiting evidence made in compromise negotiations when offered to prove the amount of a claim). Napleton submitted the following offer of proof. Before Napleton hired outside counsel in December 2018, Wilson's counsel informed Napleton that Wilson wanted to be "made whole" and keep the car. Later, as evidenced in a series of March and April 2019 e-mails, Napleton offered to buy back the car (from

the third-party financer) and inquired about Wilson's out-of-pocket costs. Napleton estimated, based on the number of lease payments thus far, the down payment, and other expenses, that Wilson had expended approximately $90,000 to date. Although Napleton termed its offer an offer of recission, its counsel later agreed that the offer was not technically a "recission" (because there was a third-party financer involved and because, as set forth elsewhere in the record, it was likely impossible to return the parties to their original position where Wilson had traded in a 2009 Mercedes at the time he acquired the lease). Wilson counter-offered seeking $218,000, plus payment of the remaining balance on the car. The proffer did not specify whether the counter-offer included keeping the car. Napleton rejected the counter-offer. In November 2020, at the end of the lease, Napleton bought the car from the third-party financer.

¶ 11 Following the offer of proof, the trial court persisted in its ruling to exclude evidence of the settlement negotiations pursuant to Rule 408. Napleton noted for the record that it did not seek to use the evidence to show the value of Wilson's claim. Rather, it sought to use the evidence to make an election-of-remedies argument and to show Wilson's failure to "mitigate." As to election of remedies, Napleton argued that Wilson could not pursue out-of-pocket costs because he had declined an offer to rescind the transaction. As to "mitigation," Napleton explained that its offer to buy back the car undermined Wilson's narrative that the car was unsellable such that he should be awarded the entirety of his out-of-pocket costs. The court was not persuaded; it noted that, while the jury would not hear evidence of Napleton's offer, the court might consider the evidence in "the bench part of this case," particularly in conjunction with its attorney-fee award.

¶ 12 On August 14, 2023, the jury entered a verdict for Wilson on count I, determining that Napleton was liable for common law fraud. The jury awarded $163,544 in compensatory damages, consisting of $138,544 in out-of-pocket costs ($114,707 in total monthly payments, $3,742 in

closing costs, $4,069 in maintenance costs, $9,325 in insurance costs, and $6,700 in license and registration fees) and $25,000 in damages for aggravation and inconvenience. The jury also awarded $1 million in punitive damages.

¶ 13                              B. Posttrial Procedure and Judgment

¶ 14        In September and October 2023, before the trial court entered judgment on the jury's verdict and damages award on count I, and before it had issued its own damages award on count II, the parties filed a series of posttrial motions. Napleton's motions challenged the trial court's evidentiary rulings, including the court's decision to admit evidence of the 2021 Miller transaction and its decision to exclude evidence of settlement negotiations pursuant to Rule 408. Napleton also challenged the jury's finding of liability on count I. It requested a remittitur of the jury's damages award or a new trial on damages. Wilson's motions argued that the jury's award was supported by the evidence, the jury's award should not be remitted, and that the court should enter the same award for count II, plus attorney fees and costs. Wilson also sought to conform the pleadings to the proof at trial with regard to the CarFax report. The trial court granted that motion.

¶ 15        On October 31, 2023, the trial court issued a written ruling on the parties' posttrial motions and entered judgment on counts I and II. On count I, common law fraud, the trial court denied Napleton's posttrial motion challenging its evidentiary rulings, though it discussed only its decision to admit evidence of the 2021 Miller transaction, not the Rule 408 ruling. It also denied Napleton's posttrial motion as it pertained to liability. However, it granted Napleton's request for remittitur. We quote the court's damages ruling in its entirety:

            "But the amount of damages awarded was, frankly, shocking and must be reduced. As argued by the defense, the plaintiff in this case suffered little if no actual damages. He drove the car without issue until he had reached his mileage limit. He had full use of a

6

luxury automobile for nearly 3 years. The payments were in part made from a children's trust. He would have had to make some type of car payments as well as insurance and maintenance costs [even if he had not leased the Aston Martin]. Although plaintiff chose to abandon the difference in value damages, the actual decreased value of the Aston Martin was somewhere between $6,000 and $40,000. Napleton's eventually took the car back and had had least indicated a willingness to rescind the contract shortly after the lawsuit was filed. The lease was fully paid off by the defendant. The total jury award of $1,163,544.62 on Count I is a massive windfall to a relatively undamaged plaintiff and the request for a *remittitur* is granted.

The court reduces the *actual* damages as follows:

Lease payments made after the accident was discovered: $55,442.04

Closing costs: $3,742.53

Maintenance costs: $4,069.42

Insurance payments: $4,662.50

License and registration fees: $6,700.00

In addition, the court affirms the jury award of $25,000 for aggravation and inconvenience. In *Gehrett v. Chrysler*[ *Corp.*, 379 Ill. App. 3d 162 (2008)], an award for "aggravation and inconvenience" was upheld under a similar fact pattern. Although it could be argued that the *Gehrett* award was for a breach of warranty claim the case law does seem to allow for damages arising out of fraudulent conduct. The jury heard testimony regarding the inability to use the car and the steps taken by the plaintiff once the fraud was discovered sufficient to support the [aggravation and inconvenience] award.

7

Total compensatory damage award; $99,616.49 on Count I; the same amount is awarded on Count II but the plaintiff can only recover the award on one of the counts.

Finally, there is the issue of punitive damages. Under *International Union* [*of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456 (2006)], the Illinois Supreme Court [set forth] the guideposts to be considered in awarding punitive damages. The three guideposts are the degree of reprehensibility of the misconduct, the disparity between the actual harm suffered by the plaintiff and the punitive damage award and the difference between the jury award of punitive damages and the civil penalties awarded in similar cases. Awards ranging from twice the compensatory damages to a factor of 10 have been upheld.

In examining reprehensibility several factors are considered. Physical harm versus economic harm, health and safety issues, a financially vulnerable target, repeated actions and intentional malice are to be considered. The court finds that the degree of reprehensibility is relatively minor. The court agrees that some punitive damages are warranted for the reasons set forth in plaintiff's brief. But, based on the testimony, the lack of health and safety issues, the lack of a financially vulnerable plaintiff, the actual damages, the type of fraud alleged and the net worth of the defendant an award of $1,000,000 is simply too high. In addition to the compensatory and punitive damage award the plaintiff will recover a large fee award on Count II. Accordingly, the punitive damages are reduced to $400,000, approximately 4 times the compensatory award."

¶ 16    On count II, violation of the Act, the trial court awarded $99,616 in compensatory damages, as set forth in the quote above. It is unclear from the court's written order whether and in what amount it awarded punitive damages for count II—the written order contained no further

discussion of damages other than that quoted above. The court awarded $185,411 in attorney fees and $5,040 in court costs.

¶ 17      On November 3, 2023, Napleton filed a postjudgment motion. Napleton observed that the trial court's written order did not clearly state, one way or the other, whether it awarded punitive damages for count II. However, Napleton did not seek clarification. Napleton argued that the court should further reduce the jury's damages award and critiqued aspects of the court's rationale in remitting the award. Napleton also argued that the court's remittitur judgment was procedurally flawed in that the remittitur judgment must present Wilson with the choice of accepting the remittitur or facing a new trial on damages:

>  "The judgment order should provide that Wilson file a consent to said judgment with the clerk of the court [within a given number of days], upon which filing, the judgment will be affirmed or, in the absence of the same, the judgment order will be reversed and the case be remanded for a new trial [on damages]. [*Peter J. Hartmann Co. v. Capitol Bank & Trust Co.*, 353 Ill. App. 3d 700 (2004)]."

As to count II, Napleton challenged the trial court's award of compensatory damages and award of attorney fees.

¶ 18      At a November 9, 2023, status hearing, several issues were discussed, including whether Wilson was required to accept or reject the remittitur:

>  "[NAPLETON'S COUNSEL]: Number two, you did order a remittitur. And we need to understand whether [Wilson] is going to accept or reject that.
>
>  ***
>
>  [WILSON'S COUNSEL]: *** I don't understand [Napleton's counsel's] comment about the acceptance or rejection of the remittitur. *** [W]e haven't actually filed any

papers in response to [Napleton's November 3, 2023, postjudgment motion]. *** I want to make sure that we don't waive any of our rights for appellate purposes by not filing something in response to their filing, just like they were concerned that, if they didn't file something, that their rights would be waived for purposes of appeal."

* * *

[NAPLETON'S COUNSEL]: And I do want to address [Wilson's counsel's] question. I have to admit I am not a remittitur expert. But having done the research, I do think it's pretty clear that the plaintiff needs to either accept or reject your remittitur. I'm assuming they are going to accept it. But I don't know that. And so—

THE COURT: I don't make that assumption. I don't know that either. And I don't expect [Wilson] to comment on that. The day I entered the judgment was [October 31, 2023], so nobody's time has run."

¶ 19      On November 29, 2023, and December 22, 2023, Wilson filed a postjudgment motion and amended response. Wilson argued that the court should reconsider its remittitur because the jury's award was supported by the evidence and, like Napleton, Wilson critiqued aspects of the court's rationale in remitting the award. Wilson argued that it was too late for the trial court to present Wilson with the choice of accepting the remittitur or face a new trial on damages, because the trial court had already granted the remittitur without including the choice in its judgment. Wilson, citing *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 253-54 (2006) (concerning a court of review's issuance of remittitur in the first instance), argued that the better course of action was to await an appeal. He continued that, if the appellate court affirmed the remittitur on the merits, then the appellate court would be charged with requiring Wilson to accept or reject it; if, on the other

10

hand, the appellate court reversed the remittitur on the merits and reinstated the jury award, Wilson's consent would not be required.

¶ 20    On December 22, 2023, Napleton filed a response to Wilson's postjudgment motion. Napleton, citing *Tri-G*, argued that Wilson's postjudgment motion constituted a rejection of the remittitur and, thus, the trial court must order a new trial.

¶ 21    On January 5, 2024, Wilson filed a reply. Wilson noted that *Tri-G* required the *court* to afford the plaintiff the choice of accepting the remittitur or facing a new trial on damages (see *id.*), and that Napleton failed to cite any authority for its assertion that a new trial on damages is required when a plaintiff fails to *sua sponte* accept the remittitur ordered by the court.

¶ 22    On January 18, 2024, the trial court conducted a hearing on the postjudgment motions. Napleton again argued that Wilson's failure to affirmatively accept the remittitur meant that the trial court must order a new trial. Wilson again argued that the trial court, not Napleton, must present Wilson with a clear choice to accept or reject the remittitur. The trial court's statements made at the November 9, 2023, status hearing could not be construed as such. Wilson represented that, "[i]f he had been put to a choice, he would have made a choice." The trial court asked:

"THE COURT: What *** if *** [t]he trial judge makes a mistake[?] His remittitur is simply wrong. What is a plaintiff to do? If [the plaintiff] accept[s] it, [is] [he] then barred from [his] appeal?

[Napleton]: No, your honor. They have two choices *** [.] Choice No. 1 is to say *** we want a new trial.

***

11

The second option is to say we accept [the remittitur] and then they can appeal it[.]

*** Rule 366 *** says when you accept the remittitur, you don't waive your arguments on appeal."

¶ 23    The trial court ruled:

"I will have to confess that none of us are experts in the area of remittitur because it is such an unusual aspect of law.

I did look at the [*Tri-G*] case that both sides seem to cite. I don't read it as strongly as [Napleton] does, so I am not going to order a new trial on that basis. The Third District may well disagree with me because I think they are going to be the next ones to take a look at this." (Emphases added.)

The trial court denied the parties' postjudgment motions, with the exception of correcting a mathematical error. It did not address whether it awarded punitive damages for count II. This appeal followed.

¶ 24                                II. ANALYSIS

¶ 25    The instant appeal and cross-appeal primarily concern remittitur procedure and damages. As to count I, the parties agree that the trial court entered an unauthorized remittitur of damages because the trial court did not obtain Wilson's consent before entering the remitted judgment. However, the parties disagree as to remedy. Napleton advocates for an automatic new trial on damages, while Wilson urges that no remedy for improper procedure is necessary. Apart from the question of remedy for improper procedure, the parties raise several issues pertaining to the merits of the compensatory and punitive damages. Napleton raises just one argument that, if successful, would arguably impact the jury's liability determination: whether the trial court erred in admitting evidence of the 2021 Miller transaction. As to count II, both parties challenge the trial court's

12

compensatory damages award and its attorney fees and costs award, the details of which we set forth in conjunction with our analysis.

¶ 26                                 A. Count I: Liability

¶ 27        We first address Napleton's argument that the trial court abused its discretion in admitting evidence of the 2021 Miller transaction. In deciding whether to admit evidence, the trial court must weigh the probative value of the evidence against its likely prejudicial effect. *Hatchett v. W2X, Inc.*, 2013 IL App (1st) 121758, ¶ 20. Prejudicial evidence is that which tends to suggest a decision on an improper basis. *Id.* Evidence of other bad acts is not admissible to show the character of a person or a propensity to commit the offense at issue. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, evidence of other bad acts is admissible to show intent, knowledge, or absence of mistake. *Id.* We review the trial court's decision to admit evidence of other bad acts for an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the position adopted by the trial court." *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 84.

¶ 28        Here, evidence of the 2021 Miller transaction was relevant to show Napleton's intent to defraud. In its October 31, 2023, posttrial ruling, the trial court stood by its evidentiary ruling, explaining:

> "Obviously, letting the testimony in [concerning the 2021 Miller transaction] was prejudicial to the defense. But, given the facts of the case, the probative value outweighed any prejudice. This was a fraud claim; the jury was entitled to hear the subsequent transaction to assess the nature of the Wilson transaction. It is incredible that, even while this lawsuit was pending with the SAME car, Napleton would not fully disclose the accident."

13

The case law supports the trial court's decision. See, *e.g.*, *Hatchett*, 2013 IL App (1st) 121758, ¶ 21 (the trial court erred in excluding evidence of an Attorney Registration and Disciplinary Commission (ARDC) complaint against an attorney for engaging in conduct similar to that complained of by the instant plaintiff; the ARDC complaint was probative of intent, knowledge, and absence of mistake). Napleton further argues that the 2021 Miller and 2015 Wilson transactions were remote in time and different in character. However, courts have upheld the admission of evidence of other bad acts occurring six years apart from the event in question. *Thompson v. Petit*, 294 Ill. App. 3d 1029, 1036-38 (1998). That the 2015 Wilson transaction involved an inaccurate CarFax report and the second transaction involved in inaccurate True360 report is not dispositive, nor is the fact that different salespersons were involved in each transaction. The probative value of the Miller transaction follows from the True360 report, which deceptively minimized the damage to the same car at issue in instant case.

¶ 29      Finally, Napleton argues that, even if the trial court properly admitted evidence of the 2021 Miller transaction, it abused its discretion in allowing it to become the focal point of the trial. See, *e.g.*, *People v. Bedoya*, 325 Ill. App. 3d 926, 938 (2001). Having reviewed the challenged evidence, we agree with the trial court's posttrial assessment that the volume of evidence did not improperly influence the jury's finding of liability. Indeed, in affirming the trial court's admission of the 2021 Miller transaction, we parenthetically observe that the trial court did exclude deposition and photographic evidence of an unrelated third transaction in which Napleton failed to provide an accurate accident report to a customer purchasing a different car, even though that transaction occurred in the same year as the instant transaction and undisclosed repairs were also coordinated by Napleton at the same repair shop. That the trial court chose to exclude evidence of this third

transaction as unduly prejudicial highlights its thoughtfulness in weighing the prejudice of the proposed other-bad-acts evidence.

¶ 30        To the extent Napleton does not otherwise challenge the sufficiency of the evidence as it relates to liability, we affirm the jury's determination of liability for count I.

¶ 31                              B. Count I: Remitted Damages

¶ 32        A party's right to a jury trial extends to all issues, including damages. *Haid v. Tingle*, 219 Ill. App. 3d 406, 410 (1991). The trial court should not substitute its judgment for that of the jury. *Id.* "A remittitur should not be granted if the jury's award falls within the flexible range of conclusions reasonably supported by the evidence." *Diaz v. Legat Architects, Inc.*, 397 Ill. App. 3d 13, 47 (2009). However, if the court concludes that the jury's damages award is excessive, the court may not allow the award to stand. *Haid*, 219 Ill. App. 3d at 410. The court must carefully examine the evidence and circumstances supporting the jury's award before it orders that the jury's assessment of damages be reduced. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 413 (1997). A court may determine that the damages award is excessive if the award exceeds the proven damages, falls outside the range of fair and reasonable compensation, is so large that it shocks the judicial conscience, or results from passion or prejudice. *Tri-G*, 222 Ill. 2d at 250, 253. The trial court's decision to remit a jury's damages award is reviewed for an abuse of discretion. *Drakeford v. University of Chicago Hospitals*, 2013 IL App (1st) 111366, ¶ 69.

¶ 33        Ordering a remittitur in lieu of setting aside an excessive jury award and remanding for a new trial on damages has consistently been acknowledged to be promotive of the ends of justice and the termination of litigation. *Tri-G*, 222 Ill. 2d at 253. The remittitur process is "essential to the judicial management of trials." *Best*, 179 Ill. 2d at 413. A remittitur is an agreement by the plaintiff to relinquish that portion of the jury's award the court has determined constitutes

15

excessive damages and to accept the sum that the court has determined to be properly recoverable. *Tri-G*, 222 Ill. 2d at 253. A remittitur is not an agreement by the plaintiff that the damages were, in fact, excessive. *Id.* Neither is remittitur an agreement by the parties. *Id.*

¶ 34        A trial court *must* afford the plaintiff the choice of accepting or refusing the remittitur, with the proviso that the failure to accept will lead to a new trial on damages. *Id.* at 253-54. The trial court does not have the authority to remit a jury award if the plaintiff does not consent. *Haid*, 219 Ill. App. 3d at 411. To do so undermines a plaintiff's right to a jury trial. See, *e.g.*, *Horvath v. Spector Freight System, Inc.*, 102 Ill. App. 2d 112, 115-16 (1968). The "[p]laintiff's consent is essential." *Haid*, 219 Ill. App. 3d at 411. The record must conclusively establish that the plaintiff consented to the remittitur. *Id.* at 417. Often, the court will set a deadline by which the consent is to be filed. See *Tri-G*, 222 Ill. 2d at 268 (21 days or any further period in which the mandate is stayed); *Haid*, 219 Ill. App. 3d at 417 (30 days). If the plaintiff refuses the remittitur, or fails to consent to it, the court must order a new trial on damages. *Tri-G*, 222 Ill. 2d at 254; see 735 ILCS 5/2-1207 (West 2022) (concerning conditional remittitur of punitive damages).

¶ 35        Our research shows that Illinois courts have taken two approaches in correcting the procedural error that follows from a remitted judgment entered without a plaintiff's consent. The first approach is to "affirm" the remitted judgment on the condition that, within a specified timeframe, the plaintiff files a consent to the remittitur. *Haid*, 219 Ill. App. 3d at 417. If the plaintiff consents to the remittitur, the remitted judgment is affirmed in a final sense. *Id.* If the plaintiff refuses the remittitur or fails to file a consent within the designated timeframe, the remitted judgment is reversed, and the case is remanded for a new trial on damages. *Id.*

¶ 36        Cases that have taken this approach include *Foster v. Springfield Clinic*, 88 Ill. App. 3d 459, 467 (1980), *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 224

16

Ill. App. 3d 559, 588-89 (1991), *aff'd*, 159 Ill. 2d 137, 171-72 (1994) (which rejected an inconsistent-verdicts challenge), and *Haid*, 219, Ill. App. 3d 417.

¶ 37 In *Foster*, the jury found for the plaintiff in a breach of employment contract case and awarded $22,152 in compensatory damages. *Foster*, 88 Ill. App. 3d at 460. The trial court remitted the damages award by $6,346 and entered judgment on the new amount without obtaining the plaintiff's consent. *Id.* at 467. The appellate court agreed that the $22,152 damages award must be reduced, explaining that the damages award represented the plaintiff's lost wages but the $22,152 figure did not take into account $6,346 in paychecks that the plaintiff received between August and October of the relevant year. *Id.* at 466. That sum, $6,346, was the "same sum" due in wages for the same period of time. *Id.* Accordingly, the appellate court, citing to Illinois Supreme Court Rule 366(a)(5) (eff. Jan. 1, 1970) (a reviewing court may enter any judgment and make any order that ought to have been given or made), "affirmed" the judgment of the trial court and awarded the plaintiff damages in the remitted sum on the condition that, within 30 days, the plaintiff file a consent to the judgment. *Foster*, 88 Ill. App. 3d at 467. If the plaintiff did not consent, the judgment would be reversed and the case would be remanded for a new trial on damages. *Id.*

¶ 38 In *Congregation*, the plaintiff's tort and breach of contract claims were based on the same set of facts and the plaintiff sought recovery for the same injury. *Congregation*, 224 Ill. App. 3d at 587. The jury awarded $3.9 million on the tort claim and $1.5 million on the breach of contract claim. *Id.* at 562. The trial court ordered a remittitur to $3,819,352 on the tort claim, to conform to the plaintiff's claimed damages and supporting evidence at trial. *Id.* at 571. The plaintiff consented to the remittitur on the tort claim. *Id.* Next, the trial court ordered a remittitur to $0 on the breach of contract claim. *Id.* The plaintiff affirmatively refused the remittitur on the breach of contract claim but the trial court nevertheless entered a judgment of $0. *Id.*

17

¶ 39        The appellate court rejected the defendant's argument that the plaintiff's failure to consent to the remittitur on the breach of contract claim mandated a new trial on damages. *Id.* at 589. It reasoned that the plaintiff could not recover twice for the same injury in any event. *Id.* It concluded that it was "not satisfied" with the trial court's handling of the remittitur but it found the most appropriate solution to be to "affirm" the remitted judgment on the condition that the plaintiff filed a consent within 30 days or face a new trial on damages. *Id.* at 591.

¶ 40        In *Haid*, the plaintiff architect sued the defendants for fees and expenses pursuant to a contract. *Haid*, 219 Ill. App. 3d at 409. The jury awarded approximately $50,000, and the trial court remitted the award to approximately $25,000. *Id.* at 415. The *plaintiff* appealed the entry of remittitur. *Id.* at 410. The defendants cross-appealed, arguing solely that a plaintiff may not initiate the appeal of a remitted judgment. *Id.* at 416. The appellate court agreed with the defendants that, generally, a plaintiff may not initiate the appeal of a remitted judgment that he accepted. *Id.* at 417. However, it noted that the record did not conclusively establish that the plaintiff consented to the remittitur. *Id.* As such, it "affirmed" the judgment of the trial court awarding the plaintiff damages in the reduced sum of $25,000, on the condition that the plaintiff consent to the remittitur within 30 days or face a new trial on damages. *Id.*

¶ 41        Setting aside the propriety of "affirming," even conditionally, a judgment that the trial court was not authorized to enter, the approach taken in these cases is not otherwise suited to the circumstances of our case. In distilling the cases taking this approach, we observe that the mathematical basis for the remitted amount was clear (*Foster*, 88 Ill. App. 3d at 467; *Congregation*, 224 Ill. App. 3d at 571), restoration of the jury award would have been of no practical effect (*Congregation*, 224 Ill. App. 3d at 588-89), or it was certain that the defendant would have declined to initiate an appeal (*Haid*, 219 Ill. App. 3d at 417). None of these

18

circumstances are present in our case; *i.e.*, there is no obvious mathematical basis underlying the full extent of the trial court's remittitur; the remittitur decision might have a practical effect because the jury's damages award for count I, if reinstated, can stand independent of the trial court's damages award on count II; and it is in no way certain how the parties might have responded below had the correct procedural steps been taken.

¶ 42    Accordingly, we turn to the second approach taken when a remitted judgment enters without the consent of the plaintiff, which is to reverse the remitted judgment and "remand the cause to afford the plaintiff an opportunity to accept the remittitur, with the knowledge that the refusal to accept such a remittitur would be a new trial on damages." *Bart v. Union Oil Co. of California*, 185 Ill. App. 3d 64, 70 (1989) (referring to this approach as the "normal disposition in the case of error in the practice of remittitur," albeit in *dicta*, as the case was remanded for a new trial on other bases); *Augustine v. Kaufman*, 338 Ill. App. 591, 593 (1949) (appellate court reversed the judgment for the remitted amount and remanded to give the plaintiff an opportunity to consent); *Baker v. Spaulding Women's Apparel*, 83 Ill. App. 2d 455, 456-57 (1967) (appellate court noted that the trial court had no authority to enter the remittitur without the plaintiff's consent, reversed the remitted judgment, and remanded for the trial court to rule (anew) on all posttrial motions).

¶ 43    This second approach is better suited to the circumstances of our case. As noted in *Bart*, this is the "normal disposition" when a trial court enters an unauthorized remittitur. *Bart*, 185 Ill. App. 3d at 70. It holds the trial court to its judicial management duties and narrows the scope of the issues that may come before this court. See, *e.g.*, *Best*, 179 Ill. 2d at 413 (judicial management); *Tri-G*, 222 Ill. 2d at 253 (remittitur promotes the end of litigation). Thus, we reverse the remitted judgments as to both compensatory and punitive damages. Before providing further direction to

19

the court on remand, we address and reject the parties' respective arguments against reversal for the trial court's failure to follow proper remittitur procedure.

¶ 44            Napleton advocates for a third approach—an *automatic* remand for a new trial on damages because the plaintiffs did not consent below to the remittitur. Napleton cites no case taking this approach, and our research has disclosed none. In support, Napleton quotes *Tri-G*:

> "[T]he court does not have the authority to reduce the damages by entry of a remittitur *if the plaintiff objects or does not consent*. The trial court must afford the plaintiff with the choice of agreeing or refusing [the] entry of a remittitur, with the proviso that the plaintiff's refusal to agree to the entry of a remittitur will result in the ordering of a new trial. The only alternative to a remittitur in a case where the verdict [is excessive] is for the trial judge to order a new trial." (Emphasis added.) *Tri-G*, 222 Ill. 2d at 253-54.

From this language, Napleton reasons that "a new trial is required if the plaintiff objects or does not consent." Napleton's reasoning omits the middle sentence of the *Tri-G* quote: "The trial court *must* afford the plaintiff with the choice ***." (Emphasis added.) *Id.* The proviso that the plaintiff will face a new trial if he objects or does not affirmatively consent to the remittitur presupposes that plaintiff has *first* been informed by *the court* of his options and had the opportunity to exercise same.

¶ 45            Here, the trial court *never presented Wilson with the choice* to accept or refuse the remittitur, nor did the trial court issue the corresponding proviso that Wilson's failure to accept the remittitur would result in a new trial on damages. We are not convinced by Napleton's argument that its posttrial pleadings and argument at the status hearing, in and of themselves, required Wilson to affirmatively indicate his acceptance of the remittitur or face a new trial. Nor did the trial court endorse Napleton's position in this regard, instead effectively indicating to Wilson that

20

he was not required to make a decision. Simply put, *Tri-G* does not support Napleton's position because Wilson was never ordered by the trial court to accept or refuse the remittitur. Rather, the trial court's comments at the January 18, 2024, hearing indicated its uncertainty as it continued to grapple with the remittitur procedure up until the day it entered judgment, asking whether a plaintiff has the right to appeal an accepted remittitur that is "simply wrong."

¶ 46    Napleton answered in the affirmative and maintains that position on appeal. It states in its reply brief: "Supreme Court Rule 366(b)(2)(ii) *** permits plaintiffs to appeal remittitur orders *to which they have consented*." (Emphasis in original.) However, a plaintiff does *not* have the unrestricted right to appeal an accepted remittitur. Rule 366(b)(2)(ii) provides that a plaintiff who accepts a remittitur is not precluded from asserting "on" appeal that the jury award was proper. Ill. S. Ct. R. 366(b)(2)(ii) (eff. Feb. 1, 1994). Courts have interpreted Rule 366(b)(2)(ii) to permit a plaintiff to appeal an accepted remittitur only where the defendant initiates the appeal. *Diaz*, 397 Ill. App. 3d at 44-45; *Haid*, 219 Ill. App. 3d at 414, 416.

¶ 47    Of course, in most instances, a plaintiff can avoid an order for remittitur it believes to be "simply wrong" by declining to accept it. If the plaintiff refuses the remittitur, and the trial court orders a new trial, the plaintiff may then file a petition for leave to appeal from the order granting a new trial under Illinois Supreme Court Rule 306(a)(1) (eff. Oct. 1, 2020) within 30 days after the entry of the order. *Haid*, 219 Ill. App. 3d at 416-17; see *Allied American Insurance Co. v. Culp*, 243 Ill. App. 3d 490, 492 (1993) (reviewing court may grant a Rule 306(a)(1) petition if it "presents grounds which are reasonably debatable and fairly challenge the propriety of the order [citation], or if it clearly demonstrates that the circuit court abused its discretion by ordering the new trial").

¶ 48    Next, we reject Wilson's argument that the trial court's failure to follow proper remittitur procedure is of no consequence. Wilson would not have us reverse the remittitur on procedural

21

grounds. Instead, Wilson would have us overlook remittitur procedure to address and reverse the remitted award on the merits and reinstate the jury award. Wilson reasons that Napleton's decision to initiate an appeal of the remitted count I damages award means that the instant appeal would be before this court regardless of whether the trial court followed proper remittitur procedure. Wilson's argument ignores that Napleton's primary position is that we should not address the remitted award on the merits due to the trial court's failure to follow proper remittitur procedure. We agree with Napleton on that point; we merely disagree that the solution is an automatic new trial. More critically, Wilson's argument ignores that the remitted judgment was never properly entered, and we do not know what Wilson's decision would have been if forced to choose between accepting the remittitur or refusing the remittitur and facing a new trial. Under either path, there is a substantial probability that the scope and issues on appeal, if any, would be different.

¶ 49        For example, if Wilson had been offered and refused the remittitur, and then declined to file or not been granted a Rule 306(a)(1) appeal, the case might have instead proceeded to a new trial and jury verdict, whereupon the instant jury's compensatory and punitive damages award would never reach this court. If, on the other hand, Wilson had accepted the remittitur, Napleton may have declined to appeal to "lock in" the remitted judgments. In the second scenario, Wilson's ability to challenge a properly entered remitted judgment would be entirely dependent upon Napleton initiating an appeal. In deciding whether to initiate an appeal under this circumstance, Napleton would have to weigh the risk that an appellate court might reinstate the jury's awards in their entirety. Contrary to Wilson's suggestion, the trial court's adherence to proper remittitur procedure is of great consequence.

¶ 50        Accordingly, upon reversing the trial court's remitted compensatory and punitive judgments, we remand for the trial court to follow proper remittitur procedure. The trial court must

22

give Wilson the opportunity to accept or decline the remitted judgments within a period of the trial court's choosing. Wilson may elect to consent to both the remitted compensatory and punitive damages judgments, neither the remitted compensatory and punitive damages judgments, or one but not the other of the remitted compensatory and punitive damages judgments. The remittitur process allows for such a bifurcation of compensatory and punitive awards. See *Slovinski v. Elliot*, 237 Ill. 2d 51, 57 (2010) (the trial court denied the defendant's motion for remittitur as to the compensatory damages award and the appellate court affirmed; the trial court granted the motion for remittitur as to the punitive damages award and the appellate court further remitted the punitive damages conditioned on the plaintiff's consent; the plaintiff did not consent and was granted leave to appeal; the supreme court affirmed the appellate court); *Turner v. Firstar Bank, N.A.*, 363 Ill. App. 3d 1150, 1165-66 (2006) (appellate court remitted the punitive damages award, conditioned on the plaintiff's consent; if the plaintiff did not consent within the time set by the trial court, then the trial court would order a new trial to determine the amount of punitive damages). Allowing Wilson to make two separate decisions, one as to compensatory damages and one as to punitive damages, is in keeping with the goals of remittitur to promote justice and judicial efficiency. See *Tri-G*, 222 Ill. 2d at 253.

¶ 51        As to justice, bifurcating Wilson's choice will allow him to assess the correctness of each remitted judgment, independent of the other judgment. In contrast, were Wilson asked to accept or decline the remitted judgments as a package, he might be compelled to accept a remitted judgment that he believes to be incorrect merely to secure a second remitted judgment of greater value or, in his assessment, of greater difficulty to replicate or surpass in a new trial. As to efficiency, bifurcation allows for the possibility that a new trial may be narrower in scope to the extent Wilson elects to accept only one of the remitted judgments. See *Turner*, 363 Ill. App. 3d at

23

1165-66 (trial court on remand may conduct a damages trial on just compensatory or punitive damages).

¶ 52    In sum, as to count I, we affirm the finding of liability, we reverse the remitted compensatory and punitive damages judgments, and we remand the case for the trial court to follow proper remittitur procedure as to both the compensatory and punitive damages awards. If Wilson accepts the remitted awards within the time prescribed by the trial court, the trial court may enter judgment on them; if Wilson does not, then the trial court will order a new trial on the award or awards to which Wilson does not consent. Given our ruling, we do not address the parties' arguments implicating the amount and/or propriety of the jury's compensatory and punitive damages awards nor the trial court's decision to remit them.

¶ 53                                C. Count II: Damages

¶ 54                          1. Count II Compensatory Damages

¶ 55    The parties each raise challenges to the trial court's count II compensatory damages award of $99,616. Generally, plaintiffs may recover damages for any injury that follows directly and naturally from their good-faith reliance on a defendant's fraudulent representations. *Gold v. Dubish*, 193 Ill. App. 3d 339, 351 (1989); see *Tan v. Boyke*, 156 Ill. App. 3d 49, 55 (1987) (consequential damages are recoverable under the Act). Such losses include out-of-pocket costs. *Gold*, 193 Ill. App. 3d at 351-52. "[A]lthough the words, 'damage,' 'damages,' and 'injury,' are sometimes treated loosely as synonyms, [they have distinct meanings]. Injury is the illegal invasion of a legal right; damage is the loss, hurt, or harm which results from the injury; and damages are the recompense or compensation awarded for the damage suffered." (Internal quotation marks omitted.) *Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 758 (1993) (quoting Ballentine's Law Dictionary 303 (3d ed. 1969)). A trier of fact's damages award is entitled to deference and will not

24

be disturbed unless it is against the manifest weight of the evidence. *People ex. rel Peters v. O'Connor*, 311 Ill. App. 3d 753, 758 (2000). A damages award is against the manifest weight of the evidence if it appears to be unreasonable, arbitrary or unsupported by the evidence. *Id.*

¶ 56    Two common approaches to calculating damages that follow as a natural consequence to a fraud include benefit-of-the-bargain or out-of-pocket computations. *Giammanco*, 253 Ill. App. 3d at 763. Under the first approach, also referred to as diminution by the instant parties, the trier of fact calculates damages based upon the difference between the actual and the represented value of the property sold. *Id.* at 759. Under the second approach, pursued by Wilson, the trier of fact must determine the costs and expenses incurred by the plaintiff due to his reliance on the defendant's fraudulent representations. *Id.* at 760. Some cases involve unique circumstances that render the two common approaches insufficient for calculating fraud damages. *Id.* at 763 (the defendant gained unfair leverage in the bargaining process when he concealed his identity and thereby damaged the plaintiff). Further, some cases may require the consideration of certain "offsetting factors" when fashioning the appropriate award. *Id.* at 766. While damages may not be predicated on speculation, "[a]bsolute certainty as to the amount of damage [is] not required to justify a recovery; it is only necessary that the evidence tend to establish a basis for the assessment of damages with a fair degree of probability." *Id.* at 765.

¶ 57    For context, we recount the procedure by which the trial court arrived at its award for count II compensatory damages. The trial court never entered judgment on the jury's count I compensatory damages award. Instead, it heard Napleton's posttrial motion for remittitur and entered a remitted judgment for count I compensatory damages and, in the same order, entered "the same" compensatory award for count II without further explanation. Neither party disputes

25

that the trial court's rationale in remitting count I compensatory damages informed its determination of count II compensatory damages.

¶ 58    In considering this procedural history, we observe that the trial court was not required to align its compensatory award with the jury's compensatory award. See *Werderman v. Liberty Ventures, LLC*, 368 Ill. App. 3d 78, 83 (2006). In *Werderman*, following a joint jury and bench trial, the jury returned a verdict for the plaintiffs on the common law fraud claim but the trial court found in favor of defendants on the statutory consumer fraud claim. *Id.* The appellate court determined that the jury's determination on factual issues in a common law fraud claim were not binding on the trial court in issuing its ruling on a statutory consumer fraud claim. *Id.* at 91. "To bind one fact finder by the other's result would infringe on either the jury right or the statutory scheme. *** [I]n order to vindicate both the right to a jury trial and the statutory command, inconsistency between the fact finders must be tolerated ***." *Id.* Of course, while inconsistency between the fact finders and awards must be tolerated, there can be no double recovery. See *Congregation*, 224 Ill. App. 3d at 589. Per *Werderman*, we do not intend our count II compensatory damages analysis below to indicate, one way or the other, any opinion as to whether the jury's count I compensatory damages award is also supported by the evidence. In reviewing the trial court's count II compensatory award, we consider only whether its award is reasonably supported by the evidence and do not reach whether the greater award determined by the jury was likewise reasonably supported by the evidence.

¶ 59    Here, the trial court's $99,616 compensatory damages award mirrored the remitted jury award, which included $74,616 for out-of-pocket costs and $25,000 for aggravation and inconvenience. As to out-of-pocket costs, Napleton argues that the election-of-remedies doctrine precludes *any* award for out-of-pocket costs. Napleton raised this argument below, and in awarding

26

damages for some out-of-pocket costs, the trial court rejected it. Alternatively, Napleton argues

that the award should be greatly reduced. Wilson argues that, absent a counterclaim by Napleton,

the trial court was not permitted to consider Wilson's use of the vehicle as a factor offsetting his

damages. Wilson also argues that the trial court's determination that Wilson was not significantly

damaged during the time that he drove the car, prior to the "discovery" of the accident, constituted

a misapplication of the discovery rule. As to aggravation and inconvenience, Napleton argues that

the Act does not authorize recovery.

¶ 60        We reject Napleton's argument that the election-of-remedies doctrine precludes any

recovery for out-of-pocket costs. Napleton argues that Wilson's decision to decline its settlement

offer barred him from pursuing damages for out-of-pocket costs. Napleton cites a string of cases,

including *Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.*, 159 Ill. App. 3d 834,

844 (1987), for the proposition that, when a defendant fraudulently induces a plaintiff to enter into

a contract, the plaintiff may either rescind the contract (and pursue out-of-pocket costs) *or* affirm

the contract (and pursue diminution damages reflecting the difference in value between the product

represented and the product received). In Napleton's view, because Wilson rejected its settlement

offer, it did not pursue recission and instead affirmed the contract, thereby leaving diminution

damages as its only option for recovering damages.

¶ 61        Napleton's argument implicates the election-of-remedies doctrine. See *Kel-Keef*

*Enterprises, Inc. v. Quality Components Corp.*, 316 Ill. App. 3d 998, 1008-10 (2000). Under that

doctrine, the "prosecution of one remedial right to judgment or decree constitutes an election

barring subsequent prosecution of inconsistent remedial rights." (Internal quotation marks

omitted.) *Id.* at 1008. However, a party's choice to pursue one remedy is not a bar to pursue a

different, inconsistent remedy unless the party causes the other party to materially change his

27

position in reliance on the party's first representation. *Id.* at 1009 (favorably citing Restatement (Second) of Contracts § 378 (1981)). A change in position is material if it is such that a shift in remedies would be unjust. *Id.* Simultaneous pursuit of inconsistent remedies is permissible if there is no threat of double recovery, the defendant has not been misled, and there is nothing about the plaintiff's action that would create a *res judicata* bar to recovery. *Independent Trust Corp. v. Hurwick*, 351 Ill. App. 3d 941, 954 (2004).

¶ 62        Wilson's pursuit of out-of-pocket costs did not run afoul of the election-of-remedies doctrine. First, Wilson's pursuit of out-of-pocket costs did not cause Napleton to materially change its position in the lawsuit. Wilson argued in each of his complaints that he sought damages for costs that, in his view, he would not have incurred but for Napleton's fraud, including financing and other charges, insurance, repairs, and maintenance. Napleton's election to buy back Wilson's car from the third-party financer (and then resell it to Miller) occurred outside the parameters of the lawsuit. Therefore, these actions do not demonstrate Napleton's change in position in the lawsuit. Similarly irrelevant is Napleton's contention that it incurred additional legal fees because Wilson refused its offer settle the case. (Napleton likewise refused Wilson's counteroffer.) Second, there was no threat of double recovery. Wilson did not pursue both out-of-pocket and diminution damages. We disagree that Wilson's postdiscovery decision to keep the car for preservation during the beginning of the lawsuit constituted a double recovery. Third, as Napleton does not dispute, there is no *res judicata* bar to out-of-pocket damages.

¶ 63        Napleton does not otherwise argue that the trial court was not permitted to award out-of-pocket costs. Napleton does, however, argue that the trial court should have assessed the out-of-pocket costs at or near $0, because, *inter alia*, Wilson would have had to incur costs for some car regardless of whether he purchased the Aston Martin.

28

¶ 64    In deciding to allow Wilson to pursue out-of-pocket costs, the trial court found that Wilson was not substantially damaged during the time he was unaware of Napleton's fraudulent representations and otherwise drove and enjoyed the car without significant mechanical issue. The trial court also noted that Napleton had offered to buy back the car, thus appearing to accept Napleton's mitigation argument as framed during its offer of proof. Thus, to the extent that Napleton challenges the trial court's Rule 408 evidentiary ruling with respect to count II, we note that the court in fact did consider Napleton's settlement offer in determining count II compensatory damages. The trial court considered offsetting factors such as Wilson's use and Napleton's offer to buy back the car in awarding approximately $74,000 in out-of-pocket costs as opposed to the $138,000 Wilson requested. Wilson submitted proof of his out-of-pocket costs, and Napleton did not disagree with the figures. However, as in *Giammanco*, the trial court determined that the unique set of circumstances here rendered a strict application of out-of-pocket costs approach for calculating damages inappropriate. 253 Ill. App. 3d at 763. Thus, while the trial court awarded Wilson the entirety of his closing costs, maintenance costs, and license and registration fees, it essentially halved his lease payments and insurance payments. We cannot conclude that the trial court's decision in this regard was against the manifest weight of the evidence.

¶ 65    Next, we disagree with Wilson that, absent a counterclaim by Napleton, the trial court could not consider Wilson's use of the vehicle as a factor offsetting his damages. In support, Wilson cites cases instructing that section 2-608 of the Code of Civil Procedure (Code) provides that a counterclaim may include a request for a setoff:

"Any claim by one or more defendants against one or more plaintiffs, or against one or more codefendants, whether in the nature of setoff, recoupment, cross claim or otherwise, and whether in tort or contract, for liquidated or unliquidated damages, or for other relief,

29

may be pleaded as a cross claim in any action, and when so pleaded shall be called a counterclaim." 735 ILCS 5/2-608 (West 2022).

Further, Wilson argues that, although section 2-608 employs permissive language, it "does not eliminate the need to include a request for setoff as part of a defendant's pleadings." *Vieweg v. Friedman*, 173 Ill. App. 3d 471, 474 (1988) (where the defendant never included a claim for setoff in his pleadings, the trial court was precluded from awarding a setoff to the defendant dealership in a breach-of-warranty case based on the plaintiff's use of the vehicle).

¶ 66        We acknowledge the ruling in *Vieweg*, but ultimately do not construe Napleton's argument for a reduction in damages as a type of counterclaim falling under section 2-608, especially where Napleton makes no argument for a setoff related to the initial sale of the car to the third-party financer. A "setoff" does not necessarily amount to a counterclaim as contemplated in section 2-608, but can also be used as an accounting method to avoid double recovery (*Barkei v. Delnor Hospital*, 207 Ill. App. 3d 255, 265 (1990)), or as a means to address a defendant's argument that the plaintiff suffered little or no damages (*Ciampi v. Ogden Chrysler Plymouth*, 262 Ill. App. 3d 94, 97 (1994) (involving common law fraud and violations of the Act)). Indeed, in *Ciampi*, the appellate court held that the defendant's request for a reduction in damages to account for the time that the plaintiff used the vehicle did not constitute a section 2-608 setoff requiring a pleading. *Id.* at 111. We similarly conclude that Napleton's argument to reduce damages based on Wilson's use of the vehicle merely demonstrated its position that Wilson suffered little or no damage during that time. It was not a counterclaim.

¶ 67        We also disagree with Wilson that the trial court's offset analysis amounted to a misapplication of the discovery rule. The discovery rule provides that the statute of limitations does not begin to run until the injured party knows or should have known of his injury. *Knox*

30

*College v. Celotex Corp.*, 88 Ill. 2d 407, 414 (1981). The discovery rule does not, of course, provide that a plaintiff is not injured until he discovers the injury. The trial court's decision to award Wilson less than the total out-of-pocket costs incurred merely reflects its reasonable view that Wilson's should not recover the entirety of his expenses associated with the car he drove and enjoyed for over two years.

¶ 68    Finally, we reject Napleton's argument that damages for aggravation and inconvenience are not recoverable under the Act. While Napleton is correct that a plaintiff must have suffered actual damages to bring an action under the Act (*Avery v. State Farm Automobile Mutual Insurance Co.*, 216 Ill. 2d 100, 180 (2005)), damages for aggravation and inconvenience are compensable under the Act if they are part of a total award that includes economic damages. *Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill. App. 3d 399, 402-03 (2009).

¶ 69    Napleton cites no case law contrary to the "*Morris* rule," but argues that the language of section 10a(a) of the Act (815 ILCS 505/10a(a) (West 2022)), particularly the 1996 amendments to the Act (Pub. Act 89-144 (eff. Jan. 1, 1996)), support that *only* damages for actual, economic injury are compensable under the Act. The dissent likewise cites no case law contrary to *Morris* but argues that *Morris* incorrectly accepted aggravation and inconvenience damages without any meaningful analysis. In our view, however, section 10a(a) can be read in a manner consistent with the *Morris* rule and post-*Morris*, we observe that the legislature has not amended the statute to exclude damages for noneconomic harm. See *People v. Smith*, 2013 IL App (2d) 121164, ¶ 17 (when a statute has *been* judicially construed and the construction has not prompted an amendment, we may presume that the legislature has acquiesced in the court's determination of the legislative intent). Nor, as we will explain, has the legislature amended the statute in response to the supreme

31

court's ultimate rejection of the 1996 amendments. See, *e.g.*, *Allen v. Woodfield Chevrolet, Inc.*, 208 Ill. 2d 12, 22-23, 29 (2003).

¶ 70　　　　When interpreting the language of a statute, our primary goal is to ascertain and give effect to the intent of the legislature. *MD Electrical Contractors, Inc. v. Abrams*, 228 Ill. 2d 281, 287 (2008). The most reliable indicator of the legislature's intent is the plain language of the statute. *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002). Each word, clause, and sentence should be given reasonable meaning and not rendered superfluous. *Brucker v. Mercola*, 227 Ill. 2d 502, 514 (2007). The language of the Act is to be construed liberally to effectuate its purpose in protecting consumers against fraud and unfair and deceptive business practices. 815 ILCS 505/11a (West 2022); *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416-17 (2002). Where the language of the Act is ambiguous, we may look to aids in statutory construction such as legislative history. *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 397-98 (2003). Questions of statutory interpretation are reviewed *de novo*. *Id.* at 307.

¶ 71　　　　Section 10a(a) of the Act, with the 1996 amended text emphasized, provides:

"Any person who suffers *actual* damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual *economic* damages or any other relief which the court deems proper; *provided, however, that no award of punitive damages may be assessed under this Section against a party defendant who is a new vehicle dealer or used vehicle dealer \*\*\*, unless the conduct engaged in was willful or intentional and done with evil motive or reckless indifference to the rights of others.*" (Emphases added.) 815 ILCS 505/10a(a) (West 2022)..

¶ 72　　　　In Napleton's view, the legislature's decision to add the words "actual" and "economic" demonstrate its intent to clarify that *only* actual, economic damages are available under the Act. It

recognizes that the phrase "actual economic damages" is part of the larger phrase "actual economic damages *or any other relief* which the court deems proper." It nevertheless reasons, without citation to authority, that "any other relief" means forms of relief other than money damages (*e.g.*, injunctive relief or declaratory relief). In its view, interpreting "any other relief" to allow damages for non-economic harm would lead to "a nonsensical result in which the second part of the sentence obviates the first part."

¶ 73    Napleton initially fails to acknowledge that the supreme court in *Allen* held that the 1996 amendments were unconstitutional special legislation. See *Allen*, 208 Ill. 2d at 22-23, 29. The amendments made it more difficult for a plaintiff consumer to, *inter alia*, obtain punitive damages against a vehicle dealer as compared to other defendants. *Id.* Napleton nevertheless persists in its argument, noting in its reply brief that the change from "actual damages" to "actual economic damages" did not underly the *Allen* court's concern with the amendments. However, the supreme court held that Public Act 89-144 was "void" and "relegate[d] the parties to such rights as they may have had prior to the enactment of this legislation." *Id.* at 33. Justice Thomas cautioned in a partial dissent that not all of the amendments were unconstitutional, although he made no argument to preserve the word "economic" and in fact agreed with the majority's decision to "invalidate the amendments to section 10a(a) of the Act." *Id.* at 37 (Thomas, J., concurring in part and dissenting in part, joined by Garman, J.).

¶ 74    When the supreme court declared the 1996 amendments to section 10a(a) void and returned parties to their pre-1996 rights (*id.* at 33), the effect was to revert section 10a(a) to its preamendment language. That language read:

"Any person who suffers damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may

33

award actual damages or any other relief which the court deems proper." 815 ILCS 505/10a(a) (West 1994).

Significantly, the legislature has not taken action to amend section 10a(a) following the supreme court's decision in *Allen*. As Napleton observes, however, post-*Allen*, the supreme court continued to hold that "actual" damages were required to sustain a cause of action. See *Avery*, 216 Ill. 2d at 196 n.11 (declining to express any significance to the 1996 legislature's insertion of the word "actual" but citing *Greisz v. Household Bank (Illinois)*, 8 F. Supp. 2d 1031, 1043 (N.D. Ill. 1998), which held that the insertion of the word "actual" had been a codification of existing law and which noted that actual damages were synonymous with general or compensatory damages). The supreme court has since quoted the 1996 section 10a(a) "economic" language, albeit with reference to other issues and without addressing its recent invalidation of the 1996 amendments to section 10a(a). See, *e.g.*, *Crittenden v. Cook County Comm'n of Human Rights*, 2013 IL 114876, ¶ 28 (punitive damages); *Krautsack v. Anderson*, 223 Ill. 2d 541, 553 n.1 (2006) (attorney fees).

¶ 75        Even if we were to accept that the 1996 amendments to section 10a(a) concerning actual economic damages were mere codifications of existing law, such that *Allen* had no effect on the scope of recovery afforded by the Act, we would still have to address the phrase "any other relief." Granted, one reasonable reading of the phrase "actual [economic] damages or any other relief" is that the word "damages" is to be juxtaposed with the word "relief" such that we understand that "relief" means only nonmonetary, equitable relief. The word "relief" is generally used in equitable contexts. See Black's Law Dictionary (12th ed. 2024) (defining "relief" as "[t]he redress or remedy, esp. equitable in nature (such as injunction or specific performance), that a party asks of a court.—Also termed remedy.").

34

¶ 76    However, another reasonable reading is to give full meaning to the word "any" and decline to insert the word "equitable" where the legislature did not include it. Indeed, the statute separately provides for injunctive relief—as well as attorney fees and costs—in section 10a(c), such that the phrase "any other relief" should be understood as broader than that. 815 ILCS 505/10a(c) (West 2022). Perhaps more compelling is that the phrase "any other relief" provides the statutory authority to award punitive damages. See, *e.g.*, *Dubey v. Public Storage, Inc.*, 395 Ill. App. 3d 342, 356 (2009). Punitive damages, of course, are not "actual, economic damages" (see *Gehrett v. Chrysler Corp.*, 379 Ill. App. 3d 162, 170 (2008)); nor are they a nonmonetary, equitable remedy. Therefore, we reject Napleton's argument that "any other relief" means only nonmonetary, equitable relief. Rather, "any other relief," being an expansive term, allows for aggravation and inconvenience damages consistent with the *Morris* rule.[1]

¶ 77    To the extent that any ambiguity remains, the legislative history supports our interpretation. Although the 1996 amendments were ultimately held unconstitutional, the relevant proceedings show that even the representatives in favor of the amendments, which aimed to *restrict* the claims and relief available under the Act, asserted that the surviving phrase "any other relief" could allow for damages related to noneconomic loss:

> "Schakowsky: My understanding is that not only would [this proposed amendment] affect fraud that's committed by car dealers, but it would eliminate any kind of compensatory damage for any kind of non-economic loss, is that true Representative?

---

[1] We disagree with the dissent that the rationale in *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 68-69 (1994), implicitly suggests damages for aggravation and inconvenience are improper under the Act. In discussing damages under the Act, the court noted that damages must be directly and proximately caused by a violation of the Act. We discern no difficulty applying this principle to noneconomic damages such as for aggravation and inconvenience.

35

\*\*\*

Cross: Well, Representative, this Section of the statute provides for actual damages. There's potential as well for punitive damages *and the statute also says, in this version, any other relief*. So there are… there's the potential for any of those.

\*\*\*

Schakowsky: So, if there were harassing collection practices, which are not unknown in this… in this field, such as threatening arrest or calling the consumer inappropriate names, this would not result… *this would not result in any kind of economic loss, is that true*?

\*\*\*

Cross: *Well, Representative, again, I look at line 12 of this Bill and it provides that any other relief could potentially be compensated*, but I would also remind you that there are four or five different areas of the law \*\*\* …

\*\*\*

Cross: …that would provide recourse for the consumer. \*\*\* [B]ut [the Consumer Fraud Act] deals *primarily* with actual damages, you are right in that respect." (Emphases added.) 89th Ill. Gen. Assem., House Proceedings, May 22, 1995, at 274-75 (statements of Representatives Schakowsky and Cross).

¶ 78    As such, when the question of recovery for noneconomic harm was directly placed before an advocate of the bill, he answered that the Act "primarily" deals with economic damages but that "any other relief could potentially be compensated" at the court's discretion. This is entirely consistent with the holding in *Morris.* For these reasons, and mindful that the Act is to be liberally construed, we determine that section 10a(a) of the Act authorizes damages for noneconomic harm.

36

¶ 79    Finally, we decline Napleton's request to reduce the trial court's $25,000 award for aggravation and inconvenience. "[T]he trier of fact *** can assess damages for inconvenience, aggravation and loss of use, notwithstanding the want of mathematical specifics so long as such assessment is reasonable and not punitive." *McGrady v. Chrysler Motors Corp.*, 46 Ill. App. 3d 136, 140 (1977). Here, Wilson testified that the car was a significant purchase for his family. It was the most expensive vehicle he had ever purchased. He tried but was unable to re-trade it. He maintained the car for several years without being able to drive it. In the interim, he repaired, maintained, and drove a Ford Mustang with over 100,000 miles on it. Napleton asserts in a conclusory manner that Wilson's aggravation and inconvenience was not more than a typical litigant. Napleton's argument ignores that Wilson testified to the aggravation of owning, maintaining, and trying to sell a car he did not want, not the aggravation of the lawsuit itself. Such an assessment is for the trier of fact. Napleton has not persuaded us that the $25,000 award for aggravation and inconvenience, nor the total $99,000 compensatory award, was against the manifest weight of the evidence.

¶ 80                              2. Count II Punitive Damages

¶ 81    As indicated previously, the trial court's written order does not clearly state whether, or in what amount, it awarded punitive damages for count II. Napleton noted this problem in its November 3, 2023, postjudgment motion, but neither Napleton nor Wilson sought clarification. In its brief, Napleton states that the trial court entered judgment "consistent with the remitted damages amount" but cites to a postjudgment order that makes no such clarification as to count II punitive damages. Wilson is silent on the issue.

¶ 82    An argument can be made that the trial court meant to award *some* punitive damages for count II in answer to plaintiff's request. The trial court stated, albeit in a paragraph addressing its

37

remittitur of count I damages, that it "agreed that some punitive damages are warranted for the reasons set forth in plaintiff's brief." Obscuring the matter, however, the trial court stated: "In addition to the compensatory and punitive damage award the plaintiff will recover a large fee award on Count II." This latter sentence is sandwiched between two sentences pertaining to the remittitur of count I punitive damages, from which we infer that the court meant: "In addition to the compensatory and punitive damage award [on count I,] the plaintiff will recover a large fee award on Count II," and thus, in the trial court's view, a remittitur of count I punitive damages is warranted.

¶ 83        Even accepting that the trial court intended to award some punitive damages for count II, it did not set forth an amount. The trial court's issuance of the $400,000 punitive award clearly pertained to count I: "Accordingly, the punitive damages are *reduced* to $400,000." (Emphasis added.) Moreover a $400,000 punitive award for count II may not be consistent with the trial court's finding that "the degree of reprehensibility is relatively minor." As such, absent a clear statement by the trial court, we cannot simply assume that, as an independent trier of fact, it likewise issued a $400,000 count II punitive damages award.

¶ 84        The trial court's silence on the issue may indicate the court's belief that any award equal to or less than $400,000 would have had no practical effect. However, the trial court's count II punitive damages award, if any, will necessarily inform Wilson's decision to accept or refuse the remitted count I punitive damages award. The lower the value of the count II punitive damages award, if any, the more likely Wilson may be to accept the remitted count I punitive damages award rather than risk the inability to replicate or exceed the remitted award in a new trial.

¶ 85        As such, on remand, we direct the trial court to clarify whether it awarded count II punitive damages and, if so, in what amount.

38

¶ 86                                     D. Count II: Attorney Fees and Costs

¶ 87           Finally, the parties challenge the trial court's award of attorney fees and costs under the fee-shifting provision of the Act, section 10a(c). 815 ILCS 505/10a(c) (West 2022). Section 10a(c) provides:

> "[I]n any action brought by a person under this Section, the Court *** may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." *Id.*

¶ 88           Under the fee-shifting provision of the Act, a successful plaintiff is entitled to recover reasonable attorney fees and costs. *Id.*; *Demitro v. General Motors Acceptance Corp.*, 388 Ill. App. 3d 15, 22 (2009). The fee-shifting provision enables defrauded consumers to obtain representation and seek redress where they might otherwise be outmatched in resources and incentivizes counsel to accept difficult cases. *Casey v. Rides Unlimited Chicago, Inc.*, 2022 IL App (3d) 210404, ¶ 20; *Copeland v. Marshall*, 641 F.2d 880, 892 (D.C. Cir. 1980). A trial court's award of attorney fees and costs is reviewed for an abuse of discretion. *Demitrio*, 388 Ill. App. 3d at 22. Great deference is warranted because the award is dependent on the trial court's superior familiarity with the case. *Id.* at 24. However, to the extent our review requires us to consider the definition of costs set forth in section 10a(c), our review is *de novo*. See *Lieberman*, 201 Ill. 2d at 307.

¶ 89                                            1. Attorney Fees

¶ 90           Wilson's fee petition set forth 20 separate categories of work, such as drafting of complaints, discovery, pretrial conferences, motions *in limine*, and trial work. Each of the 20 groupings, set forth in unnumbered paragraphs, referenced as many as 100 time entries for a total of 1,453 time entries. Wilson attached those time entries, which included the date, description of work, the person performing the work, and the time spent in one-tenth hour increments. Wilson's

39

attorneys provided evidence of the rates awarded to other Du Page County litigation attorneys and requested $475 per hour. Wilson's attorneys did not provide evidence of their own past rates, noting that they were representing Wilson on a contingency basis. In total, Wilson sought approximately $452,000 in attorney fees. Napleton responded that not all of the fees sought were necessary to Wilson's claim under the Act, as opposed to his common law claim. Napleton submitted evidence that, as recently as 2021, one of Wilson's attorneys had been awarded an hourly rate of $275 as a result of a publicly filed fee petition.

¶ 91 In its attempt to award only those fees necessary to Wilson's claim under the Act and assess the number of reasonable hours, the trial court went through each of the 20 categories, awarding 0%, 50%, or 100% in each category. In so doing, it determined that a reasonable number of hours was 494.3 for the attorneys and 48.55 for the paralegal. It stated that neither side was to "blame" for the extensive litigation and that both sides "played a role in the extremely high number of hours needed on the case" to perform motion practice, discovery, and to conduct the trial. The trial court excluded those fees associated with *voir dire*, jury instructions, and deliberations, among others. The court determined that there was sufficient evidence from which to determine the appropriate hourly rates for the attorneys and paralegal, which it set at $375 and $130, respectively. Thus, the court awarded $185,411 in attorney and paralegal fees.

¶ 92 The parties raise the following challenges to the trial court's attorney fee award: (1) per Napleton, Wilson's failure to submit evidence of his attorney's hourly rate in similar, noncontingent cases precludes the recovery of *any* attorney fees; (2) per Napleton, in the alternative, Wilson's attorneys are entitled to no more than $275 per hour, the rate that one of them received in a recent publicly filed fee petition; (3) per Napleton, the fee award should be further reduced because the litigation was not necessary where Wilson declined Napleton's 2019

40

settlement offer and where Wilson should not have received fees for work performed prior to June 2020, the date Wilson amended his complaint to include count II; (4) per Wilson, the hourly fee should be increased to $475, the prevailing market rate; and (5) per Wilson, the trial court acted without careful consideration when it summarily reduced the amount requested in the portions of the fee petition by 50%. For the reasons that follow, we reject the parties' challenges and affirm the attorney fee award.

¶ 93        Courts often use the lodestar method to calculate fees under the Act. The lodestar method multiplies the number of hours reasonably expended by a reasonable rate. *Copeland*, 641 F.2d at 891; see *Demitrio*, 388 Ill. App. 3d at 23-24. In assessing the reasonable number of hours, "a trial court is permitted to use its own knowledge and experience in assessing the time required to complete particular activities." *Demitrio*, 388 Ill. App. 3d at 24. In assessing the hourly rate, the trial court should consider the rate in the "relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." (Internal quotation marks omitted.) *Id.* at 23. The rate the attorney agreed to charge, if there is one, and/or the attorney's past rates in similar cases are relevant. *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶¶ 95, 114 (applying the lodestar method to award attorney fees under the Whistleblower Act). However, the trial court is not bound by those rates, and it may award a higher fee. *Id.* ¶ 99. To hold otherwise would run counter to the goal of fee-shifting provisions intended to incentivize attorneys to take difficult cases. See *Copeland*, 641 F.2d at 892. The party seeking fees bears the burden of presenting sufficient evidence to support a determination that the fees sought are reasonable. *Young*, 2015 IL App (1st) 131887, ¶ 102. A properly supported fee petition should specify the services performed, by whom, the time expended, and the rate charged. *Id.*

41

¶ 94    Napleton argues that Wilson's failure to attach his contingent fee agreement to the fee petition or otherwise provide evidence of his attorneys' past hourly rates is fatal to his petition. One of Wilson's attorneys represented at the hearing that Wilson entered into a contingent agreement, but Napleton notes on appeal that, hypothetically, that agreement may have contained an alternate hourly rate. Napleton cites *Young* for the proposition that a properly supported fee petition contains evidence of the attorney's standard rate. *Id.* In *Young*, however, the appellate court determined that missing information concerning the attorney's documentation supported the trial court's decision to reduce the fee sought, not deny it all together. *Id.* Here, the trial court did reduce the hourly rate.

¶ 95    Napleton next argues in the alternative that the highest rate to which Wilson's attorneys are entitled is $275 per hour. Napleton submitted evidence that one of Wilson's attorneys received that amount as a result of a 2021 fee petition. Contrary to Napleton's position, under the lodestar method, a trial court is not bound to the attorney's standard rate. *Id.* ¶ 99.

¶ 96    In this vein, we also reject Wilson's argument that the trial court was required to set the hourly rate at $475. Wilson submitted the signed declaration of fellow Du Page County attorney Amy Grogan. 735 ILCS 5/1-109 (West 2022). Grogan, like Wilson's counsel, had more than 20 years of experience. She attested that her rate has been between $375 and $450 per hour over the past two years, which was consistent with the rates charged by other Du Page County litigation attorneys. Wilson also cited *Casey*, 2022 IL App (3d) 210404, ¶ 27 (favorably citing a 2015-16 consumer law report that documented hourly rates in the $475 range). We first observe that the trial court's decision to set the hourly rate at $375 is consistent with Wilson's own evidence; Grogan represented that she has charged that amount within the last two years. Even in light of evidence supporting an hourly rate of $475, Wilson's failure to submit evidence of his attorneys'

42

standard rates supported the reduction of the fee award. See *Young*, 2015 IL App (1st) 131887, ¶ 102. Further, the trial court was free to consider Napleton's evidence that the hourly rate of one of Wilson's attorneys was $275. *Id.* ¶ 95. The trial court did not abuse its discretion in setting the hourly rate at $375.

¶ 97 We next reject Napleton's argument that the trial court was required to further reduce the fee award because the litigation was not necessary where Wilson declined Napleton's 2019 settlement offer. See *id.* ¶ 106 (in determining a reasonable fee, the trial court may consider whether the litigation was overly aggressive). At the hearing, the trial court inquired about the settlement agreement. Napleton represented, consistent with its earlier offer of proof, that it had offered to buy back the vehicle and reimburse Wilson for at least some of his out-of-pocket costs. Wilson represented that he had counteroffered, but Napleton rejected the counteroffer. Thus, the evidence supported the trial court's determination that neither party bore sole responsibility for the extensive litigation such that fees should be further reduced on that ground.

¶ 98 We also reject Napleton's argument that Wilson should not be awarded any fees incurred prior to June 2020, the date Wilson amended his complaint to include count II. A plaintiff may recover attorney fees under the Act for work performed for a common law claim when that work is inextricably intertwined with the statutory claim. *Dubey*, 395 Ill. App. 3d at 361 (the conversion and breach of contract claims were based on the same evidence necessary to pursue a claim under the Act). The mere timing of the work—*i.e.*, being performed before the statutory claim was filed—does not demonstrate that the work was not ultimately used to support the prevailing claim under the Act.

¶ 99 Related, we reject Wilson's argument that the trial court arbitrarily excluded certain categories of fees and reduced other categories by 50%. We acknowledge that a trial court abuses

43

its discretion when it declines to award the fees set forth in a prevailing party's fee petition without explanation. *Casey*, 2022 IL App (3d) 210404, ¶ 29. Here, unlike in *Casey*, the trial court explained its ruling. After reviewing a detailed fee petition and conducting a hearing, the trial court set the hourly rate and, by awarding 0%, 50%, or 100% across 20 categories, set the number of hours it deemed reasonable. The trial court noted that it excluded fees for work that clearly corresponded with the common law claim, such as work on *voir dire*, jury instructions, and deliberations. However, it also excluded fees in categories such as motions pleadings and court hearings on the initial complaint, third-party discovery for an insurance claim, the discovery depositions of numerous witnesses, and certain work related to punitive damages, and it reduced fees in categories such as discovery, deposition testimony of Napleton's employees, pretrial conferences and motions *in limine*, and trial work. These rulings can be understood by cross-referencing the trial court's 20-point ruling with the corresponding paragraphs in the fee petition. There is sufficient documentation in this case to understand and review the trial court's award. *In re Marriage of Kane*, 2016 IL App (2d) 150774, ¶¶ 28-30 (where the itemized billing statement is scrutinized by the parties and by the trial court, and a hearing is conducted, it cannot be suggested that the trial court's subsequent ruling is arbitrary). Contrary to Wilson's position, there is no requirement that the trial court issue a line-by-line review. *Id.* ¶ 31.

¶ 100 For these reasons, we find no abuse of discretion and affirm the attorney fee award of $185,411 for count II.

¶ 101                                               2. Costs

¶ 102 Wilson moved for costs pursuant to section 5-108 of the Code (735 ILCS 5/5-108 (West 2022)) and section 10a(c) of the Act (815 ILCS 505/10a(c) (West 2022)). Section 5-108 of the Code provides:

44

"If any person sues in any court of this state in any action for damages personal to the plaintiff, and recovers in such action, then judgment *shall* be entered in favor of the plaintiff to recover costs against the defendant, to be taxed, and the same shall be recovered and enforced as other judgments for the payment of money ***." (Emphasis added.) 735 ILCS 5/5-108 (West 2022).

¶ 103    Although section 5-108 of the Code specifically references "damages personal to the plaintiff," it has been relied upon as authority to award costs to prevailing plaintiffs outside the personal injury context and both parties accept its applicability here. See, *e.g.*, *Kehoe v. Wildman, Harrold, Allen & Dixon*, 387 Ill. App. 3d 454, 471-72 (2008) (breach of contract and breach of fiduciary duty actions).

¶ 104    Again, section 10a(c) of the Act provides:

"[I]n any action brought by a person under this Section, the Court *** *may* award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." (Emphasis added.) 815 ILCS 505/10a(c) (West 2022).

¶ 105    Wilson attached a line-item exhibit detailing $18,202 in costs. Napleton responded that Wilson's request for costs was too broad and that, pursuant to *Vicencio v. Lincoln-Way Builders, Inc.*, 204 Ill. 2d 295, 302 (2003), section 5-108 mandates recovery only of "costs commonly understood to be 'court costs,' such as filing fees, subpoena fees, and statutory witness fees, to the losing party." Napleton agreed that $4,980, including filing fees and certain deposition costs, represented recoverable court costs as defined in *Vicencio*. It disagreed that the following costs were recoverable: $2,500 in witness fees for other depositions; $7,755 in costs associated with other depositions that, in Napleton's view, were not "necessarily used at trial" and for transcripts;

45

$1,662 in costs for technology, statutory witness fees for trial, and deposition proceedings; and $1,305 in costs for process servers.

¶ 106    Wilson agreed that Napleton correctly identified $4,980 in "costs" mandated by section 5-108. He continued, however, that he was not restricted to "costs" mandated by section 5-108. He also sought costs pursuant to section 10a(c) of the Act. He argued that, because section 10a(c) was meant to incentivize parties and their attorneys to pursue claims even if the value of the claim was low, "costs" recoverable pursuant to section 10a(c) of the Act were more expansive than under section 5-108 of the Code. Wilson argued at the hearing: "[T]hink about if this case involved a much smaller matter of harm to a Plaintiff. The kind of cost that somebody incurs in a case would be prohibitive to bringing an action like this and people wouldn't vindicate their rights simply because the sheer expense of taking depositions and issuing trial subpoenas and all of that is expensive." Wilson noted that, in *Grauer v. Clare Oaks*, 2019 IL App (1st) 180835, ¶ 156, the appellate court had accepted a similar argument in interpreting the fee-shifting provision set forth in the Nursing Home Care Act (210 ILCS 45/3-602 (West 2016) ("[t]he licensee *shall* pay the actual damages and costs and attorney's fees to a facility resident whose rights, as specified in Part 1 of Article II of this Act, are violated" (emphasis added)).

¶ 107    After hearing argument, the court ruled: "[Wilson's] Motion for Costs is denied in part and granted in part. Pursuant to [*Vicencio*], certain costs are recoverable. The court declines to expand 'costs' beyond *Vicencio*. However, the $60 claimed for service of the initial complaint is recoverable for a total cost award of $5,040."

¶ 108    Wilson argues that the trial court erred in limiting his recovery to the costs mandated by section 5-108 of the Code and contends that the court should award additional costs permitted under section 10a(c) of the Act. As we will explain, however, the trial court *did* award costs beyond

46

those mandated by section 5-108. In addition to filing fees and the like, the court also awarded certain deposition costs. Although the court referenced *Vicencio* by name, in substance, it awarded costs pursuant to the established definition of costs set forth in *Galowich v. Beech Aircraft Corp.*, 92 Ill. 2d 157, 165-66 (1982) (defining costs as "expenses necessarily incurred in the assertion of [one's] rights in court"). Indeed, Napleton utilized the *Galowich* definition in arguing against the recovery of $7,755 in costs associated with other depositions that, in Napleton's view, were not "necessarily used at trial." *Vicencio*, in turn, while denying deposition costs under section 5-108, relied upon the *Galowich* in determining that certain deposition costs may be recoverable under other provisions. *Vicencio*, 204 Ill. 2d at 308.

¶ 109      We agree with the reasoning set forth in *Grauer* that, when the purpose of an act is to incentivize plaintiffs, *e.g.*, victims of consumer fraud, to pursue otherwise costly claims, the Act's fee-shifting provision is meant to provide a prevailing plaintiff the opportunity to recover something beyond the basic court costs to which any prevailing plaintiff suffering personal damages is entitled. *Grauer*, 2019 IL App (1st) 180835, ¶ 156. Section 5-108 already *mandates* the recovery of those basic court costs to any such prevailing plaintiff. 735 ILCS 5/5-108 (West 2022). Section 10a(c), in turn, *authorizes* the court, in its discretion, to award costs to the plaintiff. 815 ILCS 505/10a(c) (West 2022). It would make little sense if an allowance of discretionary costs under a provision meant to incentivize the pursuit of costly litigation allowed for *less* potential recovery of costs than a statute mandating costs to any plaintiff in a civil suit who suffered personal damages. Rather, knowing that a prevailing plaintiff suffering personal damages in any civil suit would already be entitled to basic court costs under section 5-108 of the Code, the legislature intended to authorize the court, in its discretion, to provide broader costs under section 10a(c) of the Act.

47

¶ 110    Napleton argues that the *Grauer* court's reasoning was specific to the Nursing Home Care Act. Indeed, the *Grauer* court recognized that costs to procure medical evidence can be prohibitively high and, in addition, the plaintiffs likely to pursue a claim under that act were *per se* vulnerable in that they were in a physical state that required nursing home care and, frequently, of advanced age such that they would have a legitimate concern that they would not live to see the resolution of their claim. *Grauer*, 2019 IL App (1st) 180835, ¶¶ 126, 152. Prospective victims of the Act do not share similar *per se* vulnerabilities. However, neither does the Act provide that costs *shall* be paid by a defendant who has violated the Act. Instead, the Act provides that the court *may* award costs to the prevailing party. 815 ILCS 505/10a(c) (West 2022).

¶ 111    We are not persuaded by Napleton's citation to *TruServe Corp. v. Ernst & Young, LLP*, 376 Ill. App. 3d 218, 227 (2007). There, in the context of reviewing an arbitrator's decision, the court stated that it was "gross error" to award costs for expert witness fees pursuant to section 10a(c). However, *TruServe* relied upon *Vicencio*, which is a section 5-108 case. Summarily relying on a section 5-108 case to discern the scope of recoverable costs under section 10a(c) begs the instant question of whether section 10a(c) allows for a broader recovery of costs than section 5-108.

¶ 112    We recognize, as the nursing home in *Grauer* argued, that other statutes contain fee-shifting provisions that more precisely define recoverable costs and expenses. See *Grauer*, 2019 IL App (1st) 180835, ¶ 148; see also 740 ILCS 175/4(d)(2) (West 2022) (the Illinois False Claims Act provides that a successful litigant is entitled to the "amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs"); 740 ILCS 174/30(5) (West 2022) (the Whistleblower Act allows a successful plaintiff to seek recovery for "compensation for any costs incurred as a result of a violation, including litigation costs, expert

48

witness fees, and reasonable attorney's fees"). Ultimately, however, in interpreting section 10a(c) of the Act, we are persuaded that the fee-shifting provision incentivizing litigants to pursue, and attorneys to accept, difficult and otherwise cost-prohibitive cases, should enable the court, in its discretion, to award costs necessarily incurred.

¶ 113    In this case, contrary to the parties' arguments, the trial court *did* award costs beyond those mandated by section 5-108. For example, the court awarded deposition costs, such as videographer fees and reporter's transcript and attendance fees, associated with witnesses whose deposition testimony was read or played to the jury. These witnesses included Miller (the third purchaser of the car), the expert who testified to the car's valuation, a dealer who refused to buy the car in 2018, as well as a witness from the repair shop. It does not appear that the court allowed Wilson to recoup litigation costs incurred merely for his convenience rather than his necessity. See *Galowich*, 92 Ill. 2d at 166-67 (courts should not "encourage increased deposition taking, and consequent increases in the delay and expense of litigation, with the prospect that the expense may eventually be recouped in an award of costs"). Wilson makes no attempt to further delineate the costs set forth on its chart or to argue with greater specificity that certain denied costs were particularly necessary to assert his rights at trial. Where section 10a(c) allows the trial court to award costs, and where the court here awarded "to some extent at least" costs necessarily incurred by Wilson to assert his rights at trial, we find no abuse of discretion. See *id.* at 165.

¶ 114                                    III. CONCLUSION

¶ 115    The judgment of the circuit court of Du Page County is affirmed in part, reversed in part, and remanded with directions.

¶ 116    Affirmed in part and reversed in part; cause remanded with directions.

¶ 117    JUSTICE ANDERSON, concurring in part and dissenting in part:

49

¶ 118    I am not surprised the trial judge viewed $1.16 million in damages as being excessive. It is not as though the Aston Martin was a DB5 driven by a British spy. Indeed, the first James Bond movie, Dr. No (Eon Productions 1961), did not even cost that much to produce. But, I agree with the majority that the trial judge followed an incorrect procedure.

¶ 119    Nonetheless, I depart from the majority's decision over the recognition of "aggravation and inconvenience" damages under the Act. First, the cases that consider aggravation and inconvenience as a component of compensatory damages rest on an unsteady analytical foundation. Second, the statutory language does not permit vague and incalculable damages, as Illinois courts have repeatedly held. Third, awarding aggravation and inconvenience damages is imprudent and contrary to the purpose of the Act for several reasons.

¶ 120    At the outset, however, I feel some discussion is needed regarding *Allen v. Woodfield Chevrolet, Inc.*, 208 Ill. 2d 12 (2003). As the majority correctly notes, effective January 1, 1996, our legislature amended the Act to read in pertinent part as follows, with newly-added language emphasized: "Any person who suffers *actual* damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual *economic* damages or any other relief which the court deems proper ***." (Emphases added.) Pub. Act 89-144 (eff. Jan. 1, 1996) (amending 815 ILCS 505/10a(a)). In *Allen*, our supreme court seemingly struck down the amendment in its entirety, including the emphasized text quoted above. *Allen*, 208 Ill. 2d at 33. The emphasized language relating to damages was not at issue in *Allen*, but the supreme court declared the amendments (Pub. Act 87-1140 (eff. Jan. 1, 1993) and Pub. Act 89-144 (eff. Jan. 1, 1996)) unconstitutional—it did not say that only parts of the amendments were unconstitutional. *Allen*, 208 Ill. 2d at 33. That said, Justice Thomas, joined by Justice Garman, wrote separately to express the view that "the remaining amendments to section

50

10a are perfectly constitutional." *Id.* at 34 (Thomas, J., concurring in part and dissenting in part, joined by Garman, J.). Was he merely emphasizing what he felt the majority decided? Or did his statement express a view regarding the other aspects of the amendments that five other justices declined to adopt? To me, it appears to be the latter. Yet, even since *Allen*, dozens of judicial decisions, from federal courts sitting in Illinois (*Trinity Metals, LLC v. U.S. Conveyor Technologies Manufacturing, Inc.*, No. 23-CV-1149, 2023 WL 4626935, at \*7 (C.D. Ill. July 19, 2023)), to the Illinois Supreme Court (*Crittenden v. Cook County Comm'n on Human Rights*, 2013 IL 114876, ¶ 28; *Krautsack v. Anderson*, 223 Ill. 2d 541, 553 (2006)), to the Illinois Appellate Court (*Bain v. Airoom, LLC*, 2022 IL App (1st) 211001, ¶ 33; *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 75), have quoted the unconstitutional amended language and treated the Act as though it conveys a cause of action to a person who has suffered *actual* damage and as though it empowers a court to award actual *economic* damages.

¶ 121 While clarification from our supreme court regarding the distinction between the *Allen* holding and post-*Allen* practice would be welcome, we do not need it for purposes of our decision today, for two reasons. First, the majority's acceptance of aggravation and inconvenience damages is largely focused on the "or any other relief which the court deems proper" language from the statute, which *Allen* did not impact. Second, even without the 1996 amendment that tightened the type of damages that could trigger a claim and award under the Act, the amendatory language merely clarified and codified an interpretive approach that had already been taken, and continues to be taken, by our courts. Indeed, the requirement of "actual" damage has been repeatedly held to mean those damages that are pecuniary, concrete, ascertainable, calculable, and economic; damages that are speculative or theoretical are insufficient. See *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014) (actual damages " 'requires that the plaintiff suffer actual

51

pecuniary loss' " (quoting *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (actual damage means a pecuniary injury)); *Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954, 957 (N.D. Ill. 2008) (to establish actual damages, a plaintiff must show she has been harmed in a concrete, ascertainable way that affected plaintiff in a way that made her tangibly worse off); *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 275, 283 (2005) (Karmeier, J., concurring) (stating "[t]heoretical harm is insufficient. Damages may not be predicated on mere speculation, hypothesis, conjecture or whim" and concluding "[h]aving sustained no pecuniary harm, plaintiffs lack the actual economic damages necessary to sustain their cause of action"); *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 628 (2008) (actual damage requires that the plaintiff suffer "actual pecuniary loss"); *Verb v. Motorola, Inc.*, 284 Ill. App. 3d 460 (1996) (plaintiff failed to allege actual damage where allegations were based on mere theoretical possibilities of injury); *Petty v. Chrysler Corp.*, 343 Ill. App. 3d 815, 823 (2003) (damages may not be predicated on mere speculation, hypothesis, conjecture, or whim); and *Burkhart v. Wolf Motors of Naperville, Inc.*, 2016 IL App (2d) 151053, ¶ 22 (actual damages must be calculable and "measured by the plaintiff's loss" (internal quotation marks omitted)). With this in mind, I turn to the infirmities that are connected to awarding aggravation and inconvenience damages under the Act.

¶ 122                              I. Flawed Precedent

¶ 123        The notion of aggravation and inconvenience damages for a violation of the Act seems to have largely originated in *Roche v. Fireside Chrysler-Plymouth, Mazda, Inc.*, 235 Ill. App. 3d 70, 86 (1992). There, the plaintiff sued a car dealership for conversion and statutory fraud. A jury awarded the plaintiff $2,405 in compensatory and punitive damages for conversion. The trial court also found the defendant had violated the Act and awarded the plaintiff $750 in additional damages for aggravation and inconvenience. The appellate court affirmed, stating:

52

"Here, plaintiff was misled by [defendant] into believing that her trade-in vehicle was ample down payment for the new [car] and that [defendant] could arrange financing for her if she needed it. When this representation proved to be untrue and [defendant] failed to sell plaintiff the new [car] based on the terms of the original agreement or to return her used car or the equity in it, a direct violation of the Consumer Fraud Act occurred and resulted in damage to plaintiff. Accordingly, the trial court did not err in awarding plaintiff damages under the Consumer Fraud Act in the amount of $750 for aggravation and inconvenience." *Id.*

¶ 124 That is the entire analysis. Absent from *Roche* is any meaningful discussion of whether and why aggravation and inconvenience should be included as components of compensatory damages for a violation of the Act. Indeed, it is not even clear whether the general availability of such damages was in dispute.

¶ 125 In *Xydakis v. Target, Inc.*, 333 F. Supp. 2d 686 (N.D. Ill. 2004), the court considered whether nominal damages were sufficient to support a claim under the Act. The court stated:

"[P]laintiff *** implies that he did suffer some actual damages as a result of defendant's alleged violations of the Act. In doing so, he relies on [*Roche*], in which the court determined that a jury award of $750 for 'aggravation and inconvenience' was not erroneous. In *Roche*, however, the plaintiff had demonstrated that she suffered other harm as a result of the defendant's wrongdoing and her aggravation was only part of the award. [Citation.] In any case, plaintiff fails to allege any such harm and, as we stated when dismissing the claim, fails to allege any actual damages resulting from defendants' conduct." *Id.* at 688.

¶ 126    That brings us to *Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill. App. 3d 399, 402-03 (2009). In *Morris*, the plaintiff claimed that a car dealership engaged in deceptive conduct during an attempted vehicle sale to her brother. Although the dealership informed the brother that the purchase was subject to financing approval, it accepted a down payment and allowed him to take the vehicle home while the financing remained unresolved. *Morris*, 392 Ill. App. 3d at 400. A few days later, the dealership contacted him under the guise of needing additional signatures. When the brother returned with the plaintiff, the dealership informed them that financing had not been approved and attempted to pressure the plaintiff into co-signing the loan. When she refused, the dealership demanded the return of the vehicle but would not return the brother's down payment. Employees allegedly shouted at the plaintiff, blocked their exit with other vehicles, and contacted the police to report the car stolen. *Id.* The car was ultimately returned in exchange for a refund of the down payment. The plaintiff eventually sued under the Act, seeking damages for emotional distress, inconvenience, and aggravation. *Id.* at 401.

¶ 127    The *Morris* court affirmed the dismissal of the statutory fraud claim. The court rejected the plaintiff's damages claims, finding that the Act "provides remedies for purely economic injuries," and that actual damages must be "calculable and 'measured by the plaintiff's loss.' " *Id*. at 402 (quoting *Chicago v. Michigan Beach Housing Cooperative*, 297 Ill. App. 3d 317, 326 (1998), and citing *White v. DaimlerChrysler Corp.*, 368 Ill. App. 3d 278, 287 (2006)). Further, *Morris* synthesized *Roche* and *Xydakis*, finding that damages for aggravation are compensable under the Act only when they are part of a total award that includes actual economic damages. *Id.* 402-03 (citing *Xydakis*, 333 F. Supp. 2d at 688). Thus, the plaintiff's claim under the Act failed only because she could not link a pecuniary loss to her damages for inconvenience, aggravation, and emotional harm. *Id*. at 403.

54

¶ 128　　　　Amongst *Roche*, *Xydakis*, and *Morris*, we have only one case where a plaintiff recovered damages under the Act for aggravation and inconvenience. Again, that case (*Roche*) involved a $750 award and offered almost no analysis as to the propriety of its decision. It is confounding that a legal principle recognized in such a passing fashion in *Roche* can become so indelibly ingrained in our jurisprudence without any meaningful scrutiny.[2] Nonetheless, the majority here relies on this series of cases to sign off on aggravation and inconvenience damages based on an alleged link between Wilson's pecuniary loss and his claimed aggravation and inconvenience.

¶ 129　　　　　　　　　　　II. Statutory Language and Supreme Court Precedent

¶ 130　　　　The majority rests its analysis, largely, on the court's authority to award "any other relief the court deems proper." However, this language cannot be read as a blank check allowing an award of subjective, noneconomic damages. It follows immediately after the Act's express authorization of "actual" damages, which (even without the 1996 amendment to "actual economic damages" and the supreme court's decision in *Allen*, 208 Ill. 2d at 22-23, 29 (majority opinion), has always been held to mean actual *economic* damages. The language signals the legislature's

---

[2] See, *e.g.*, *Ainsworth v. Jidd Enterprises, LLC*, 2024 IL App (1st) 230938-U, ¶ 28 ("Illinois law provides that if the plaintiff has suffered an economic loss, noneconomic injuries such as emotional distress, inconvenience, and aggravation are compensable" under the Act); *Olson v. Ferrara Candy Co.*, 2025 IL App (1st) 241126, ¶¶ 67-71 (reversing dismissal on pleadings grounds); *Demarco v. CC Services Inc.*, 2017 IL App (1st) 152933-U, ¶ 40 (acknowledging *Roche* and *Morris* but finding that the plaintiff failed to adequately allege that she suffered "aggravation and inconvenience" due to the defendant's conduct). While *Demarco* is a Rule 23 decision that predates the changes to circumstances in which Rule 23 cases may be cited, the former prohibition on the use of Rule 23 dispositions applied, under its plain terms, to parties and not courts. *Byrne v. Hayes Beer Distributing Co.*, 2018 IL App (1st) 172612, ¶ 22.

55

focus on measurable pecuniary loss. In that context, "other relief" is best understood to refer to equitable remedies such as rescission, restitution, or injunctive orders—all of which can further the Act's consumer-protection purpose. See Black's Law Dictionary (12th ed. 2024) (defining "relief" as "[t]he redress or remedy, esp. equitable in nature (such as injunction or specific performance), that a party asks of a court—Also termed remedy.") If "any other relief" included every form of noneconomic harm imaginable, the opening limitation to "actual" damages (again, always deemed to mean actual *economic* damages) would be meaningless. Courts avoid readings that render statutory language superfluous. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 441-42 (2010).

¶ 131      *Roche* and *Morris* stretched this language beyond recognition by treating it as an invitation to graft damages for aggravation and inconvenience onto the statute. That interpretation both undermines the Act's economic focus and conflicts with the well-settled principle that compensable damages must be identifiable and quantifiable. It makes little sense to require that actual monetary damages serve as a gateway to bootstrap aggravation and inconvenience damages. Either such harms are independently compensable under the Act, or they are not.

¶ 132      The majority's analysis conflicts with Illinois Supreme Court precedent involving available damages. In *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 68-69 (1994), our supreme court considered the Act's "other relief which the court deems proper" language. That case was decided well before the 1996 statutory amendment that tightened recoveries to "actual economic damages." Even under the broader preamendment statutory language that existed, the court recognized that "other relief" includes punitive damages but does not permit the court "free rein to award any amount of damages it chooses. The damages must be 'proper.' " *Id.* at 68. Specifically, damages must be a "direct and proximate" result of a violation of the Act. *Id.* at 68-69 (citing cases with

approval). See *Garcia v. Wells Fargo Bank, N.A.*, 653 F. Supp. 3d 501, 520 (N.D. Ill. 2023) (to prevail under Act, a plaintiff must demonstrate that the defendant's conduct is the cause of the injury, requiring a showing of both "causation in fact" (*i.e.*, "but for") and "legal causation" (*i.e.*, foreseeability)). Aggravation and inconvenience damages are not direct and proximate because they are inherently subjective, unforeseeable, and not tied to any pecuniary loss. They are remote and indirect at best.

¶ 133       Damages for aggravation and inconvenience also conflict with longstanding precedent that damages must be based on an actual loss that is sufficiently quantifiable, as discussed above. That was the clear message in *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100 (2005), a consumer fraud and breach of contract case. There, an expert witness noted that the plaintiff sought, in part, "specification damages," which he defined as "damages *** incurred when [the insurer] specified a non-OEM part on the repair estimate." *Avery*, 216 Ill. 2d at 119. While addressing the requisite showing for those damages in an Act claim, the supreme court explained that "reliance on specification damages is entirely inappropriate for [a plaintiff's] consumer fraud claim. As explained in our discussion of plaintiffs' breach of contract count, specification damages are not, in fact, real or measurable damages and, hence, in no way constitute 'actual damage' within the meaning of the Act." *Avery*, 216 Ill. 2d at 197-98. Thus, for damages to be compensable under the Act, they must be identifiable and measurable. Here, the damages sought for aggravation and inconvenience are immeasurable and thus, as in *Avery*, are not compensable.

¶ 134       Our supreme court has noted a similar standard in a variety of other contexts and cases in which compensable damages are not defined by statute. See, *e.g.*, *Midwest Sanitary Service, Inc. v. Sandberg, Phoenix & Von Gontard, P.C.*, 2022 IL 127327, ¶ 49 (stating, "Therefore, when the

punitive damages paid in an underlying action are proximately caused by the attorney's alleged negligence, they are an element of compensatory damages in a malpractice action when the damages are certain and not speculative, compensate the plaintiff for its losses, and do not punish the negligent attorney."); *In re Estate of Powell*, 2014 IL 115997, ¶ 13 (stating, "Actual damages are never presumed in a legal malpractice action and the plaintiff must demonstrate that he has sustained a monetary loss as a result of the lawyer's negligent act. [Citation.] Damages are considered speculative only if their existence is uncertain, not if the amount is uncertain or yet to be fully determined."); *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 248 (2006) (stating, "The controlling principles are well established. 'A recovery may be had for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty.' *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 289 (1917)."); *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 314 (2005) (stating, "A mere change in the identity of the judgment creditor, without more, entails no quantifiable damages. It is therefore insufficient to meet the requirement of actual damages necessary to sustain a cause of action for legal malpractice."); *Van Laten v. City of Chicago*, 28 Ill. 2d 157, 161 (1963) (Stating in a challenge to a zoning ordinance that the "testimony did not fix the extent of damages to [certain property]. The evidence does not establish any significant or measurable loss in value of such property"). In the absence of any evidence of quantifiable or measurable loss, a damage award for aggravation and inconvenience is improper.

¶ 135     Further, section 10(a) of the Act tempers the Court's authority to award actual economic damages and other relief by requiring appropriate discretion. That discretion is not boundless. Permitting awards that are inherently subjective, immeasurable, and untethered to pecuniary loss, pushes discretion beyond its limits. Such awards invite arbitrary and inconsistent results and shift

58

the Act away from its central purpose of remedying economic harm caused by deceptive practices. To my mind, the better view is that it would constitute an abuse of discretion to recognize aggravation and inconvenience damages under the Act.

¶ 136     Nor should our statutory analysis be influenced by the fact that the legislature has not amended the Act since *Morris*. Sometimes silence is not consent; it is just silence. Legislative indifference is "merely a jurisprudential principle; it is not a rule of law." *People v. Perry*, 224 Ill. 2d 312, 331 (2007). It is not conclusive (*Blount v. Stroud*, 232 Ill. 2d 302, 325 (2009)), and that is especially true when we are talking about appellate rather than supreme court decisions. A failure to amend a law does not necessarily amount to endorsement of prior judicial gloss, particularly when that gloss lacks meaningful reasoning in the first place, as happened in *Roche* and *Morris*. To suggest otherwise risks elevating silence into lawmaking and freezes into permanence what may have been an analytical misstep from the start. If anything, the fact that our legislature amended the statute (effective January 1, 1996) to clarify that only actual *economic* damages are available demonstrates the legislature's dissatisfaction with the 1992 decision in *Roche*.

¶ 137             III. The Purpose of the Act and the Imprudence of Vague Damages

¶ 138     In addition to resting on a weak precedential foundation, and a suspect statutory analysis, *Roche* and *Morris* turn the statute into something it was never intended to be. There are at least three reasons why the wisdom behind awarding compensatory damages for "aggravation and inconvenience" is as frail as the caselaw that purportedly supports it.

¶ 139     First, the Act was not designed to soothe bruised feelings but, rather, to redress real financial harm. It exists to protect consumers and businesses from deceptive practices that result in actual, measurable economic injury. Including "aggravation and inconvenience" as compensable damages erodes the statute's focus, blurs the boundary between legal wrongs and

ordinary consumer dissatisfaction, and opens the courthouse doors to every minor grievance masquerading as a legal harm. Such an expansion not only burdens courts with trivial claims but also invites speculative damage claims, since aggravation and inconvenience are inherently subjective, unquantifiable, and elastic. Even when interpreting a law commonly referred to as the "Consumer Fraud Act," Illinois courts are not akin to a customer service counter at the mall.

¶ 140 Second, when determining damages for statutory fraud, Illinois courts most commonly follow the benefit-of-the-bargain rule. *Mulligan*, 382 Ill. App. 3d at 627. That approach requires that damages be calculated by assessing the difference between the actual value of the property sold and the value the property would have had at the time of the sale if the representations had been true. *Id.* Awarding aggravation and inconvenience damages fundamentally changes the way compensatory damages are calculated in a fraud case. Every lawyer who is prosecuting a claim under the Act (assuming pecuniary damages also exist) ought to seek leave to amend to plead aggravation and inconvenience damages. After all, how often is the victim of fraud *not* aggravated and inconvenienced? Imagine how the plot to Casino Royale (Eon Productions 2006) would have been different if the terrorists who gave Le Chiffre $100 million to invest had only lost their money but were not *also* aggravated and inconvenienced.

¶ 141 Third, Illinois law already provides remedies for severe emotional or dignitary harms. Those claims require higher thresholds of harm for a recovery precisely because they lack the objective benchmarks of economic injury. The Act was not intended to duplicate or replace these remedies.

¶ 142 For these reasons, we ought to reject the reasoning in *Roche* and its progeny that treats aggravation and inconvenience harm as a component of compensatory damages. Perhaps these are proper considerations in awarding punitive damages, but that question is not before us. The Act

60

does not grant a license to sue every time a consumer feels slightly shaken or mildly stirred. For those reasons, I respectfully dissent from the majority's analysis concerning aggravation and inconvenience damages. I concur with all other aspects of the majority opinion.

*Wilson v. Napleton's Goldcoast Imports, Inc.*, 2025 IL App (3d) 240079

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 18-L-1245; the Hon. David E. Schwartz, Judge, presiding. |
| **Attorneys for Appellant:** | Timothy D. Elliott and James W. Scales, of Rathje Woodward LLC, and John J. Pcolinski Jr., of Guerard, Kalina & Butkus, both of Wheaton, for appellant. |
| **Attorneys for Appellee:** | Kevin P. McJessy and Joseph J. Borders, of McJessy Ching & Thompson, LLC, of Chicago, for appellee. |